

DA 10-0548

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 47

JUDITH NEWMAN, as Personal Representative
of the ESTATE OF KARLYE NEWMAN,

        Plaintiff and Appellant,

  v.

ROBERT LICHFIELD, and WORLD WIDE
ASSOCIATION OF SPECIALTY PROGRAMS
AND SCHOOLS, INC.,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                      In and For the County of Sanders, Cause No. DV 06-164
                      Honorable John Warner, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Lawrence A. Anderson, Attorney at Law, Great Falls, Montana

                James A. Manley, Ann L. Moderie, Manley Law Firm, Polson, Montana

                Elizabeth A. Best, Best Law Offices, P.C., Great Falls, Montana

                Thomas J. Beers, Beers Law Offices, Missoula, Montana

        For Appellees:

                Sue Ann Love, Jardine, Stephenson, Blewett & Weaver, P.C.,
                Great Falls, Montana

                William S. Kronenberg, Murphy, Pearson, Bradley & Feeney,
                San Francisco, California

Submitted on Briefs:  December 14, 2011

Decided:  March 6, 2012

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1   Judith Newman (Newman), mother of and personal representative of the estate of Karlye Newman, appeals from certain pretrial and trial rulings made in the Twentieth Judicial District Court of Sanders County, Montana, concerning the suicidal death of Karlye while at a boarding school for troubled teenagers. The District Court limited the scope of evidence regarding foreseeability, denied Newman's motion for partial summary judgment as to joint liability for the tortious conduct of the defendants, and excluded certain evidence of the history of the defendants' schools and programs. A jury found that defendants Robert Lichfield (Lichfield) and the World Wide Association of Specialty Programs and Schools, Inc.[1] (WWASP), were not negligent, did not commit deceit or negligent misrepresentation, and were not liable for the possible wrongful acts of other defendants regarding Karlye's death.

¶2   We affirm in part, reverse in part, and remand for a new trial.

**ISSUES**

¶3   Newman raises three issues on appeal. A restatement of the issues is:

¶4   1.   Did the District Court err in limiting the scope of evidence concerning foreseeability?

¶5   2.   Did the District Court err in denying partial summary judgment as to joint tortious conduct by the defendants?

---

[1] Also known as World Wide Association of Specialty Programs, Inc.

3

¶6    3.  Did the District Court err in excluding certain evidence of the history of the defendants' programs and schools?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶7    After years of working at boarding schools designed to assist troubled teens, Lichfield and colleague Brent Facer (Facer) started similar specialty schools and related businesses that provided services to the schools.  Around 1996, Lichfield and others formed Peacox Enterprises, LLC (Peacox), and purchased the property and facilities of a former boarding school in Thompson Falls, Montana.  The group also formed Utah-based Spring Creek Lodge, LLC, to operate a specialty boarding school for trouble teenagers on the Thompson Falls property.  Cameron Pullan (Cameron) was hired as director, and his twin brother Chaffin Pullan (Chaffin) was hired as associate director.  Cameron had a high school education and previously worked as an electrician, YMCA counselor, and shift supervisor at Cross Creek Manor, a Utah-based facility for wayward youth, owned by Lichfield and Facer.  Chaffin previously worked as a waiter, ran a handyman business, and was a residential manager of Cross Creek Manor.

¶8    Around 1997, Lichfield and Facer formed Teen Help, LLC (Teen Help); National Contract Services, LLC (National Contract); WWASP; and other entities.  Teen Help dealt with admissions to specialty schools.  Parents would contact Teen Help and select a school where they wished to place their child.  Teen Help would then place the child at a school and receive a commission from the school.  National Contract provided billing, collections, consulting, and budget services for the specialty schools in exchange for a percentage of each school's gross income.  WWASP provided seminars, support groups,

a web-based communication program, a magazine, a Policy and Procedure Manual listing its responsibilities and those of its member schools, and a combination of purchasing, public relations, and consulting services in exchange for an association fee of $75 per student per month from the schools. In addition, WWASP member schools were required to sign contracts with other companies owned by Lichfield and his relatives.

¶9 Meanwhile, Cameron helped form a Montana-based Spring Creek Lodge, LLC, to own and operate the school in Thompson Falls. In 1999, while Peacox retained title to the property and buildings, the Utah-based Spring Creek Lodge, LLC, sold the school to the Montana-based Spring Creek Lodge, LLC.[2] Under a lease requiring the land to be used for a WWASP member school, Peacox leased the property to the Montana-based Spring Creek Lodge, LLC. In 2000, the Montana-based Spring Creek Lodge, LLC, was dissolved and Spring Creek Lodge, Inc. (Spring Creek), a Montana close corporation, was formed. It was created to run an independent boarding facility and school for minor children and engage in business transactions. Cameron was the registered agent of Spring Creek and held forty percent of the ownership interest, while the remaining shares were held by four other shareholders, all family members of Lichfield. As director, Cameron was responsible for Spring Creek's operations, including treatment and education, policy implementation, and staff supervision. Chaffin became the assistant director of Spring Creek, though he never became a corporate officer or director.

¶10 Spring Creek utilized products and services from Teen Help, National Contract, and WWASP. Using the basic WWASP model, the Spring Creek staff drafted the 2004

---

[2] Also known as Spring Creek Academy or Spring Creek Lodge Academy.

policy and procedure manual, including numerous challenges the students could use to earn credits and privileges. As presented by the parties, the challenges included:

(1) carrying a bucket of rocks every step a student took for days or weeks;
(2) having groups of students stay up all night holding a log, with a loss of all points if it touched the ground;
(3) dressing male students as girls; and
(4) jumping blindfolded off a bridge into a pond during winter months.

¶11 Spring Creek charged parents a monthly fee of $2,990 per child, which later increased to $3,490 per month. An accounting of finances for Spring Creek in 2004 showed gross revenues of $17,385,403, a payment of management fees of $5,789,339, an occupancy expense of $495,134, and quality control services of $377,900. In addition, Cameron and Chaffin received a monthly salary, bonuses for every student that enrolled, and dividends, sometimes totaling close to $400,000 per year. Cameron and Chaffin both expressed concern in their pretrial depositions about the amount of money leaving Spring Creek to pay the other companies, which they believed made it difficult to properly run the school.

¶12 Just a few years after Spring Creek was formed, Newman's daughter Karlye was having behavioral problems as a high school freshman. In the fall of 2003, Newman sent Karlye to the Brush School, a boarding school in New Mexico. Karlye attended there until she was expelled in March 2004 for taking so much Benadryl she had to be hospitalized. Consulting Teen Help, Newman enrolled Karlye in Spring Creek on March 31, 2004, after seeing a brochure about Spring Creek. Though Newman only wished for Karlye to stay at Spring Creek through June 2004, the minimum contract length Spring Creek would accept was twelve months. Newman signed Spring Creek's required

twelve-month enrollment contract, paid the requisite fees to Spring Creek, and Karlye entered the program.

¶13 The WWASP Manual, intended as a guideline for member programs with student populations, suggested that no students with suicidal behavior be admitted. However, the brochures advertising Spring Creek, which Newman reviewed, indicated the facility was suitable for suicidal youths. The evidence established that no formal assessments were done when students entered the program to determine if the students were suicidal upon admission, nor was the Spring Creek staff provided with specific suicide assessment training. As a result, the Spring Creek staff was largely unaware of Karlye's history of depression and suicidal behavior prior to her admission. One of the only alerts was a check mark for "Suicide Thoughts/Talk" placed on Teen Help's Admission Criteria form.

¶14 Throughout her time at Spring Creek, Karlye struggled with learning. She was emotional, injured herself, made suicidal threats, was placed on "high risk" status, and was put in solitary confinement on multiple occasions. Spring Creek documented numerous instances where Karlye was depressed, suicidal, wanted a therapist, or attempted suicide. Newman was never informed of these events, nor was she allowed to visit Karlye, and Karlye was not allowed to contact Newman.

¶15 On October 7, 2004, Karlye was found unconscious with a sweatshirt tied around her neck, having hanged herself from a doorknob in the bathroom of the dormitory where she lived. She died after being airlifted to a hospital in Missoula. She was sixteen years old.

¶16 On October 23, 2006, Newman brought suit for the alleged negligent care and treatment that caused Karlye's death. She sued Spring Creek Lodge Academy; Spring Creek Lodge, LLC; Spring Creek Lodge, Inc.; Cameron Pullan; Chaffin Pullan; and John Does 1 through 20, as the parties responsible for or involved in the planning, supervision, management, operation, or profiting from Spring Creek. Newman alleged the defendants were liable for their independent tortious conduct, were vicariously liable for the acts of their fellow agents, employees, or others under their control under the theory of respondeat superior, and were jointly liable with the other defendants. In the complaint and the amended complaint, Newman stated claims for wrongful death, negligence, breach of contract, constructive fraud, breach of fiduciary duty, breach of duty of good faith and fair dealing, and deceit.

¶17 In June 2008, the defendants moved for summary judgment on the issue of the individual liability of Cameron and Chaffin. Newman then filed a second amended complaint on July 9, 2008,[3] which added defendants Lichfield; Teen Help; Premier Educational Systems, LLC f/k/a WWASP; Peacox; and National Contract. With the exception of the breach of contract claim, all the counts previously stated were alleged against these additional defendants, as were violations of the Consumer Protection Act and civil conspiracy. Newman also alleged premises liability against Peacox.

¶18 In early 2010, Newman settled her claims against Spring Creek, Teen Help, and National Contract. Lichfield, WWASP, and Peacox remained as defendants. The court

---

[3] Newman filed a third amended complaint on December 30, 2008. We need not address it for the purposes of this Opinion.

8

then granted Peacox's motion for summary judgment, and in September 2010, denied Newman's motion for summary judgment.

¶19 Three experts retained by Newman testified at trial as to numerous violations of the standard of care of the Spring Creek program, and that the WWASP model of care is contraindicated for a youth like Karlye. Newman also sought to call journalist Maia Szalavitz (Szalavitz) at trial as an expert witness relative to her research on "tough love" schools, but the District Court excluded her testimony. Moreover, the District Court restricted the scope of evidence allowed before the jury to matters directly linked to Karlye as an individual and what she knew, and did not allow evidence pertaining to foreseeability and the knowledge of the defendants concerning the propriety of their programs for students like Karlye.

¶20 On October 27, 2010, after a twelve-day jury trial involving twenty-five witnesses, the jury delivered a defense verdict. The jury found that Lichfield and/or WWASP were not negligent, did not commit deceit and/or negligent misrepresentation, and were not liable for any wrongful acts of WWASP, Spring Creek Lodge, Teen Help, or National Contract.

¶21 Newman appeals. She contends that a number of the rulings made by the District Court before and during trial were in error and restricted her ability to show foreseeability and prove vicarious liability.

**STANDARD OF REVIEW**

¶22 "A district court has broad discretion in determining whether evidence is relevant and admissible." *Weber v. BNSF Ry.*, 2011 MT 223, ¶ 18, 362 Mont. 53, 261 P.3d 984;

9

*see In re T.W.*, 2006 MT 153, ¶ 8, 332 Mont. 454, 139 P.3d 810.  We review a district court's evidentiary rulings for an abuse of discretion.  *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 74, 338 Mont. 259, 165 P.3d 1079; *T.W.*, ¶ 8.  The abuse of discretion question "is not whether this Court would have reached the same decision, but, whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason."  *Lopez v. Josephson*, 2001 MT 133, ¶ 14, 305 Mont. 446, 30 P.3d 326; *see United Tool Rental, Inc. v. Riverside Contr., Inc.*, 2011 MT 213, ¶ 10, 361 Mont. 493, 260 P.3d 156.  Our review of a discretionary ruling based upon a conclusion of law is plenary, and under such circumstances we review to "determine whether the court correctly interpreted the law."  *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 26, 351 Mont. 464, 215 P.3d 649; *T.W.*, ¶ 8.

¶23     Duty is a question of law which we review for correctness.  *Geiger v. Dept. of Revenue*, 260 Mont. 294, 298, 858 P.2d 1250, 1252 (1993).  Foreseeability is generally "confined to the duty element of negligence under Montana law."  *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 39, 342 Mont. 335, 181 P.3d 601.  Negligence actions ordinarily involve questions of fact, though "when reasonable minds cannot differ, questions of fact can be determined as a matter of law."  *Poole v. Poole*, 2000 MT 117, ¶ 14, 299 Mont. 435, 1 P.3d 936.  We review a district court's findings of fact for error and conclusions of law for correctness.  *Cenex Pipeline LLC v. Fly Creek Angus, Inc.*, 1998 MT 334, ¶ 22, 292 Mont. 300, 971 P.2d 781; *LaMere v. Farmers Ins. Exch.*, 2011 MT 272, ¶ 13, 362 Mont. 379, 265 P.3d 617.

¶24 "We review summary judgment rulings de novo. Applying the same M. R. Civ. P. 56 criteria as the district court, we determine whether the moving party has established both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law." *LaMere*, ¶ 13.

## DISCUSSION

¶25 *Issue One: Did the District Court err in limiting the scope of evidence concerning foreseeability?*

¶26 Newman argues on appeal that a number of the pretrial rulings made by the District Court were fundamentally flawed in that they unduly limited the scope of the evidence allowed before the jury. Newman contends that the court failed to apply this Court's "zone of risk" foreseeability analysis, and instead adopted a narrow "foreseeable plaintiff" paradigm. Under the "foreseeable plaintiff" paradigm, Newman argues that the court mistakenly limited evidence of negligence to matters directly linked to Karlye as an individual, thus restricting the jury's understanding of what the defendants actually knew pertaining to other suicide attempts and conditions at Spring Creek.

¶27 Conversely, the defendants argue that foreseeability, as part of the duty element of a negligence action, was not at issue at trial because of Newman's settlement with Spring Creek.[4] The defendants further contend that any evidence of bad acts before or after Karlye attended Spring Creek were attributable to Spring Creek and not Lichfield or WWASP, and was therefore properly excluded. Accordingly, the defendants maintain the court properly ruled that events that occurred before Karlye attended Spring Creek

---

[4] Spring Creek's negligence was not at issue before the District Court and likewise is not at issue in this appeal.

11

and after her death, as well as anything beyond what she personally "saw, heard, experienced, [or] felt" could not possibly have contributed to her death. They argue that evidence of other bad acts by Spring Creek and those of other schools having nothing to do with Karlye or the care provided to her while at Spring Creek, were not relevant to the disputed issues or sufficiently probative to outweigh their prejudicial effect. Furthermore, the defendants claim that any error made by the District Court in limiting the evidence was harmless, since the jury concluded that Lichfield and WWASP were not vicariously liable.

¶28 Pertinent to the issue at hand, the District Court ruled that the evidence at trial would be limited to that which was known by Karlye, witnessed by her or within her general knowledge, and had to do directly with her death. The court determined that this case was not about other schools, students, or places, but specifically about Karlye as an individual and her time at Spring Creek. Ultimately, the court admitted evidence as to what Karlye knew, and did not allow evidence pertaining to what the defendants knew, as the latter was "so highly prejudicial" and had "such small probative value to prove notice." Newman's counsel protested on numerous occasions, arguing that the evidentiary limitation was unfair and precluded Newman from proving the foreseeability of Karlye's suicide. She insisted that evidence of "what occurred to other people and their notice of what occurred to other people" was relevant and probative of the foreseeability of Karlye's suicide.

¶29 We conclude that the District Court abused its discretion when it limited the evidence concerning negligence to what Karlye knew and what happened to Karlye.

12

"Under Montana law, the duty element of negligence turns primarily on foreseeability." *Poole*, ¶ 20. As stated in *Fisher*, "[i]n analyzing whether a duty exists, we consider whether the imposition of that duty comports with public policy, and whether the defendant could have foreseen that his conduct could have resulted in an injury to the plaintiff." *Fisher*, ¶ 17.

¶30 As *Fisher* instructs, the question in analyzing the existence of a duty turns on whether *the defendant* could have foreseen that his conduct could have resulted in an injury to the plaintiff. Here, the District Court determined it appropriate to admit evidence of what Karlye knew, but exclude evidence of what the defendants knew. This analysis is contrary to our case law.

¶31 A negligence claim requires the plaintiff to establish that the defendant owed a legal duty, and there existed a breach of that duty, causation, and damages. *Poole*, ¶ 19. "Foreseeability as it relates to the duty element of negligence is measured on a scale of reasonableness dependent upon the foreseeability of the risk involved with the conduct alleged to be negligent." *Lopez v. Great Falls Pre-Release Servs.*, 1999 MT 199, ¶ 27, 295 Mont. 416, 986 P.2d 1081. We have said: "[i]f a reasonably prudent defendant can foresee neither any danger of direct injury nor any risk from an intervening cause he is simply not negligent." *Busta v. Columbus Hosp.*, 276 Mont. 342, 362, 916 P.2d 122, 134 (1996) (quoting *Mang v. Eliasson*, 153 Mont. 431, 437, 458 P.2d 777, 781 (1969)). Conversely, it stands to reason that if a reasonably prudent defendant can or should foresee a danger of direct injury, he may be negligent. Again, the focus is on what the defendant could or could not foresee.

13

¶32    The jury in a negligence action is tasked with deciding whether the risk in question—here, Karlye's despair and resulting suicide—was foreseeable to the defendants.  In order to make an informed determination, the jury in this case had to assess what the defendants knew regarding the school's program and whether it was designed or intended to treat suicidal teens, what the defendants knew about the successes and failures of the program in dealing with suicidal teens, and what the defendants knew about Karlye specifically.  Without this information, the jury could not determine whether it was foreseeable to these defendants that Karlye was at risk of injury while a student at Spring Creek.

¶33    Moreover, we disagree with the defendants' contention that because the issue of *Spring Creek's* negligence was settled prior to trial, so too was the issue of negligence as it pertained to them, and their related argument that all of the evidence Newman sought to introduce at trial went solely to the issue of what was foreseeable to Spring Creek.  It was WWASP that designed and supplied the Policy and Procedure Manual to its member schools, listing the responsibilities of its member schools, including Spring Creek, and it was Lichfield who formed the network of entities responsible for the operation of the school.  While a jury could certainly conclude that neither Lichfield nor WWASP could have foreseen the risk of Karlye's suicide and thus were not negligent, that determination is for the jury to make only after it hears all the relevant evidence.

¶34    The District Court stated that the evidence that pertained to foreseeability was "highly prejudicial," had "small probative value," and therefore should be excluded.  We conclude to the contrary.  The District Court's exclusion of this evidence was highly

14

prejudicial to Newman, as it largely prevented her from being able to argue foreseeability, duty, and negligence on the part of Lichfield and WWASP. Because this issue was at the heart of the jury trial, we conclude it was an abuse of discretion to exclude this foreseeability evidence.

¶35  We remand to the District Court for a new trial in which evidence that shows what Lichfield and/or WWASP knew regarding the program's treatment of mentally unstable minors and the dangers the programs might pose to minors similarly situated to Karlye is allowed. In addition, the District Court shall allow evidence of other problems that previously existed at Spring Creek, so long as they were predictable of the problems Spring Creek faced when dealing with suicidal or disturbed minors like Karlye. Evidence of previous similar problems occurring at other member schools may also be allowed, as long as it is established that Lichfield and/or WWASP was aware of those problems, and the program at the member school in question was the same as the program in effect at Spring Creek.

¶36  *Issue Two: Did the District Court err in denying partial summary judgment as to joint tortious conduct by the defendants?*

¶37  Newman sought partial summary judgment prior to trial, arguing that Lichfield and WWASP acted in concert with others in causing the wrongful death of Karlye, and that they should be held liable in common for their joint tortious conduct under *Restatement (Second) of Torts* § 876 (1979). Conversely, Lichfield and WWASP claimed that there was an absence of admissible evidence in the record as to common liability for joint tortious conduct.

¶38 On September 1, 2010, the District Court denied Newman's motion for partial summary judgment on this issue of common liability. The court found that the documentary, affidavit, and deposition evidence in the record was sufficient to raise a material issue of fact on the issue of joint tortious conduct. Specifically, the court noted that the facts did not establish whether the already dismissed defendants tortiously caused Karlye's death, whether Lichfield and WWASP acted in concert with or pursuant to a common design with the already dismissed defendants, or whether Lichfield and WWASP gave the already dismissed defendants substantial assistance or encouragement in tortiously harming Karlye.

¶39 Summary judgment is appropriate only when no genuine issues of material fact are shown from the pleadings, discovery and disclosure materials on file, and affidavits, and when the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). "A material fact is a fact that involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issue by a trier of fact." *Corp. Air v. Edwards Jet Ctr. Mont. Inc.*, 2008 MT 283, ¶ 24, 345 Mont. 336, 190 P.3d 1111 (quoting *Arnold v. Yellowstone Mt. Club, LLC*, 2004 MT 284, ¶ 15, 323 Mont. 295, 100 P.3d 137. The moving party bears the burden of establishing both the absence of genuine issues of material fact and the entitlement to judgment as a matter of law. *Smith v. Burlington N. & Santa Fe Ry.*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639. Questions of negligence typically involve questions of fact and are generally not suited for summary judgment. *Fisher*, ¶ 12; *LaTray v. City of Havre*, 2000 MT 119, ¶ 15, 299 Mont. 449, 999 P.2d 1010.

16

¶40 Both parties cite *Sloan v. Fauque*, 239 Mont. 383, 784 P.2d 895 (1989) as the leading case in Montana on joint liability for joint tortious conduct. In *Sloan*, we adopted the theory of § 876 of the *Restatement (Second) of Torts* (1979), which states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

¶41 On appeal, Newman argues that no genuine issues of material fact exist regarding the joint liability of the defendants for each other's torts, in that the "[m]assive evidence shows that WWASP and Lichfield gave assistance and encouragement to Teen Help, Spring Creek Lodge, the Pullans, and others who breached duties to Karlye Newman." She asserts that such "substantial assistance or encouragement" meets the requirements articulated in *Sloan*, and demonstrated in *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 280 (D. Mass. 2008).

¶42 More specifically, Newman argues that Lichfield exercised control over Spring Creek. She states that Lichfield periodically visited Spring Creek to see that his policies were followed, that he presented Cameron with contracts that diverted fees to corporations within Lichfield's control, and that he required Cameron to sign those contracts. Newman also argues that Lichfield controlled the operations of Teen Help, which she alleges improperly marketed Spring Creek, improperly incentivized

17

admissions, and used telemarketing tactics to address concerns raised by parents. Newman also alleges that Lichfield controlled the operations of WWASP and the policies of Spring Creek, through which he "coerced" the schools to decrease the number of students discharged early and to "attack the honesty of students who brought allegations against them."

¶43 In response, the defendants argue that it is necessary to establish the *intent* of a defendant to be jointly involved in acts which result in the tort, as ostensibly required by *Sloan* and the cases cited therein. The defendants also cite *Sloan* for the proposition that affirmative and voluntary actions, substantial assistance, and encouragement must be present in order to establish the requisite intent of the joint tortfeasors. *Sloan*, 239 Mont. at 385-86, 784 P.2d at 896-97. In the instant case, the defendants argue that intent to be jointly involved in a tort was not shown, nor were the *Sloan* elements of knowledge and substantial assistance or encouragement, and therefore Newman did not establish the absence of any genuine issue of material fact. *Restatement (Second) of Torts* § 876 (1979); *Sloan*, 239 Mont. at 385, 784 P.2d at 896.

¶44 As noted in *Sloan*, one of the subsections under the *Restatement (Second) of Torts* § 876 (1979) must be met in order for a person to be subject to liability for the harm resulting to a third person from the tortious conduct of another. Sloan, 239 Mont. at 385, 784 P.2d at 896. Such a determination must be based on the facts of each case. In the instant case, the facts necessary to determine this potential liability are in dispute.

¶45 As provided in subsection (b) of the *Restatement (Second) of Torts* § 876 (1979), a person is subject to liability for the harm to a third person from the tortious conduct of

18

another if: 1) the other's conduct is a breach of duty, 2) he *knows* that the other's conduct is a breach of duty, and 3) he provides substantial assistance or encouragement to the other for such conduct. (Emphasis added.) The requirement of the knowledge element is further articulated in *Sloan*. *Sloan,* 239 Mont. at 386, 784 P.2d at 896-97. Newman did not definitively show prior to trial that Lichfield or WWASP *knew* that the negligence of another was a breach of duty to Karlye, and that they nonetheless provided substantial assistance or encouragement to that person or entity. Both Lichfield and WWASP deny any knowledge of Karlye's admission to Spring Creek, and of her care and treatment while there. Because the material facts central to a finding of joint liability are in dispute, the District Court did not err in denying Newman's motion for partial summary judgment on this issue.

¶46    *Issue Three: Did the District Court err in excluding certain evidence of the history of the defendants' programs and schools?*

¶47    Newman argues on appeal that the District Court should have allowed Maia Szalavitz, an investigative journalist, to testify during trial and that it was error to exclude her testimony. Szalavitz is a journalist, researcher, and author of *Help at any Cost,*[5] a compilation of the history of programs for troubled teens. She amassed information on WWASP schools from her research and interviews, and was prepared to testify about "tough love" boarding schools and the history, ideology, and methods used at the WWASP schools. The defendants moved the District Court to exclude her testimony under several of the Montana Rules of Evidence.

---

[5] Maia Szalavitz, *Help at Any Cost: How the Troubled Teen Industry Cons Parents and Hurts Kids* (Riverhead Books 2006).

19

¶48 The District Court barred Szalavitz from testifying, concluding that she was "trying to indict the entire program." The court determined that the results of her research would primarily be "hearsay offered for the purpose of proving [it] is a failed program," and that cross-examination would only reveal how she got the information and not whether the information was true.

¶49 According to Newman, Szalavitz had specialized knowledge as a historian of "tough love" schools, and under M. R. Evid. 702 and Montana case law, was a qualified expert who should have been able to testify. Newman also contends that Szalavitz's testimony would have assisted the jury's understanding of key issues, such as the defendants' notice of abuse and dangerous conditions in the schools, the defendants' breach of duty to Karlye, and the defendants' assistance and encouragement of the breaches of duty to Karlye by other defendants.

¶50 The defendants argue that Szalavitz's testimony was properly prohibited under one or more of the Montana Rules of Evidence. First, they argue that Szalavitz, an investigative journalist, was not qualified as an expert in the operation of specialty schools or treatment of students at specialty schools, and her opinions consequently could not be admitted as expert opinions under M. R. Evid. 702. Second, they argue that she was a journalist whose research consisted of interviews with miscellaneous third persons, and that her testimony therefore would be hearsay in the classic sense. M. R. Evid. 802. Third, they contend that Szalavitz's proposed testimony was not relevant under M. R. Evid. 402, as it was not connected to the cause of Karlye's death or the relationship between Spring Creek and Lichfield, or Spring Creek and WWASP. They also opine that

her opinions were that "all specialty schools and persons connected therewith [were] misguided, incompetent and harmful," and that even if some of her proposed testimony was relevant, its probative value did not substantially outweigh the danger of unfair prejudice, confusion of issues, and misleading the jury. M. R. Evid. 403. Lastly, the defendants argue that Szalavitz did not have personal knowledge of the operations at Spring Creek, the events related to Karlye's treatment, or the relationships among the parties, and therefore her testimony was properly barred for lack of personal knowledge pursuant to M. R. Evid. 602.

¶51 According to the Montana Rules of Evidence, relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Any evidence that is relevant is admissible, unless prohibited by constitution, statute, Rules of Evidence, or other rules applicable in the state. M. R. Evid. 402. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403.

¶52 In reviewing the record, we find that the District Court provided Newman with opportunities to show how Szalavitz's testimony was relevant, and even provided examples of the types of evidence that might be admissible. The District Court offered to conduct a Rule 402 hearing outside of the presence of the jury with Szalavitz present in order to determine the relevancy of her proposed testimony. However, Newman declined

21

to present Szalavitz for a hearing and instead filed an offer of proof, which the court rejected.

¶53 As noted above, a district court has broad discretion in determining whether evidence is relevant and admissible. *Weber*, ¶ 18. We conclude the District Court did not abuse that discretion when it excluded the testimony of Szalavitz under the foregoing circumstances. The court appropriately expressed concern over the hearsay nature of her testimony and its relevancy. On retrial, the court may revisit this issue, and if it is satisfied that under our ruling with respect to Issue One, some of Szalavitz's proposed testimony would be relevant and otherwise admissible, it may allow her to testify within limitations it deems appropriate.

**CONCLUSION**

¶54 Based on the foregoing, we affirm in part and reverse in part. We remand to the District Court for a new trial.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ JIM RICE