DA 11-0366

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 308

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

NEVADA R. UGALDE,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 09-344
Honorable Susan P. Watters, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

         Gregory D. Birdsong; Birdsong Law Office, PC; Missoula, Montana

      For Appellee:

         Timothy C. Fox, Montana Attorney General; Pamela P. Collins, Assistant
         Attorney General; Helena, Montana

         Scott Twito, Yellowstone County Attorney; Juli M. Pierce, Deputy
         Yellowstone County Attorney; Billings, Montana


               Submitted on Briefs: July 10, 2013
                     Decided: October 17, 2013


Filed:

_____
                       Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Nevada Ugalde appeals her conviction by a jury in the Thirteenth Judicial District Court of aggravated assault, a felony.  We consider the following issues on appeal:

¶2    *1.    Whether the District Court should have dismissed the charges against Ugalde when, after Ugalde disclosed information and defense strategies to the State Medical Examiner, communication occurred between the Medical Examiner and the Yellowstone County Attorney.*

¶3    *2.    Whether Ugalde is entitled to a new trial on the ground that the State's witnesses were unnecessarily cumulative or unfairly prejudicial to Ugalde.*

¶4    *3.    Whether Ugalde is entitled to a new trial on the ground that the prosecution presented prejudicial victim impact testimony.*

¶5    *4.    Whether Ugalde is entitled to a new trial on the ground of prosecutorial misconduct during closing argument.*

¶6    *5.    Whether Ugalde is entitled to a new trial because her counsel provided ineffective assistance.*

¶7    We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶8    On the morning of June 11, 2008, Nevada Ugalde placed several urgent phone calls to Susan Napier, the mother of the child she was babysitting.  Through tears, Ugalde told Napier that the child, I.N., had fallen from the crib and expressed concern about the way he was acting and breathing.

¶9    Napier did not have a vehicle with her, so she began walking toward Ugalde's home.  Meanwhile, Ugalde called her husband and told him about I.N.'s condition. Ugalde's husband asked or told her to "Call 911," hung up the phone, left his workplace,

2

and began driving home. On the way, he spotted Napier walking on the side of the road and stopped to pick her up. They arrived at the Ugalde home together, approximately thirty minutes after the initial phone call between Ugalde and Napier. Ugalde never called 911.

¶10 Ugalde handed I.N. to Susan at the front door. I.N.'s eyes were nearly closed and he was barely breathing. Ugalde's husband took Susan and I.N. to the emergency room at the Billings Clinic.

¶11 In the emergency room, Dr. Curtis Lee discovered multiple injuries to I.N.'s head and internal bleeding. Dr. Linda Johnson, a general practice pediatrician, and Dr. Eugen Dolan, a neurosurgeon, were called in to assist with I.N.'s care. Dr. Johnson helped identify and reduce immediate problems with intracranial pressure. Dr. Lee and Dr. Dolan decided to fly I.N. to a children's hospital in Denver for additional treatment.

¶12 Since the incident, I.N. has undergone extensive physical, speech, and occupational therapy. I.N. suffered hearing loss and visual impairments requiring several surgeries. The State's professional witnesses believed the injuries were inconsistent with simply falling from a crib to a carpeted floor.

¶13 Several people involved with I.N.'s treatment reported the incident to law enforcement pursuant to mandatory reporting obligations. On June 29, 2009, the State filed an Information charging Ugalde with aggravated assault in violation of § 45-5-202, MCA (2007). The Information alleged that Ugalde purposely or knowingly "shook or slammed" I.N. on June 11, 2008, causing serious bodily injury. Ugalde entered a plea of

3

not guilty and received a public defender. Due to a conflict, Ugalde was appointed new counsel on July 2, 2009.

¶14 Ugalde's counsel decided she would need to retain a pathologist as an expert. To that end, she consulted with Eric Olsen, coordinator for resource allocations to contract counsel for the Office of the Public Defender [OPD], to comply with the OPD's internal policy that requires approval for any expenses over $200.

¶15 After voicing concerns about funding, Olsen explained that he was "not inclined to approve the request" and instead put Ugalde in contact with Dr. Gary Dale, the State Medical Examiner at the State Crime Lab. Ugalde could consult Dr. Dale without charge due to an agreement between the OPD and the State Crime Lab.

¶16 Under the impression that her communications would be kept confidential, Ugalde's counsel spoke with Dr. Dale. Dr. Dale remarked that the State's identification of Dr. Thomas Bennett as an expert in the case surprised him, in part because he knew the State already was aware of potential problems with using Dr. Bennett in child abuse cases. Dr. Dale recommended Dr. Mary Case as an independent expert for the defense. Dr. Dale never signed a written agreement with the public defender's office or with Ugalde's counsel. Nor apparently did he discuss with defense counsel any agreement to maintain confidentiality.

¶17 After concluding that his involvement with Ugalde was "terminated," Dr. Dale telephoned Dennis Paxinos, the Yellowstone County Attorney, and discussed what he perceived as problems with the use of Dr. Bennett as an expert in this case. Dr. Dale warned against using Dr. Bennett as a witness, though he indicated that he agreed with

4

Dr. Bennett's conclusion that the injuries were inconsistent with an accidental cause. Paxinos later related the information obtained from Dr. Dale to the prosecutor handling the case.

¶18 On November 25, 2009, Ugalde filed a motion to dismiss the charge for alleged violations of confidentiality and due process. Ugalde argued that by revealing defense information and strategy to Paxinos, Dr. Dale violated a duty to keep his consultation with Ugalde's counsel confidential. In addition, Ugalde's motion alleged interference with the attorney-client relationship in violation of the Sixth Amendment and a violation of the right to effective assistance of counsel.

¶19 The District Court denied the motion to dismiss on March 16, 2010, concluding that Dr. Dale owed the defense no duty of confidentiality and that the proper remedy in any event would be disqualification of the witness—not dismissal of the Information. The court rejected Ugalde's due process violation and Sixth Amendment arguments. Finally, the court concluded that these facts did not demonstrate ineffective assistance of counsel.

¶20 Trial commenced on April 19, 2010, and lasted five days. The State listed twenty-two anticipated witnesses in its trial brief and called eighteen witnesses at trial. One witness for the State, Dr. Smith, was added fourteen days before the trial began.

¶21 On the first day of trial, Ugalde objected to the State's plan to call more than ten witnesses, especially the wide range of experts called to establish the element of serious bodily injury. Ugalde's counsel argued that the parade of witnesses was unnecessary,

cumulative, and could serve only to generate hostility toward Ugalde and sympathy for the victim.

¶22 In response, the court asked if Ugalde would stipulate to the element of serious bodily injury and thereby remove the State's obligation to prove that required element of the offense. Ugalde's counsel indicated that she was not comfortable stipulating to serious bodily injury. The court stated, "Then I think the State has to prove it." The court overruled each of Ugalde's many subsequent objections to cumulative testimony throughout the trial. In total, the State called approximately eleven witnesses over the next three-and-a-half days to testify to various aspects of the injuries to I.N.

¶23 The theory of the defense was that I.N. fell from the crib at Ugalde's home. Ugalde called two expert witnesses: Dr. Kenneth Monson, a biomechanical engineer, who testified that the injuries could have been caused by a short accidental fall, and Dr. John Plunkett, a pathologist, who explained that a short fall could cause this constellation of injuries. Dr. Plunkett also testified about a growing skepticism to shaken baby syndrome in certain sections of the medical community—particularly biomechanical engineers and, increasingly, pathologists. Lisa Justis, a social worker, testified about I.N.'s ability to pull himself up to a position where falling from the crib was possible, and Ugalde also testified on her own behalf. In its closing argument, defense counsel emphasized that, despite the surfeit of expert witnesses, the State could not eliminate the possibility of an accidental cause of the injuries beyond a reasonable doubt.

¶24 On April 23, 2010, a unanimous jury found Ugalde guilty of aggravated assault. The District Court sentenced her to twenty years, with five suspended, and ordered her to pay $1,331,636.65 in restitution.

¶25 Following the trial, Ugalde filed a motion for a new trial or dismissal based on Dr. Dale's disclosure of confidential information to Paxinos, cumulative evidence, the presentation of evidence previously ruled improper, and improper closing argument. The District Court denied the motion. Ugalde appeals her conviction and the court's denial of her motion for a new trial.

## STANDARD OF REVIEW

¶26 We review for abuse of discretion a district court's denial of a motion for a new trial. *State v. Thorp*, 2010 MT 92, ¶ 39, 356 Mont. 150, 231 P.3d 1096 (2010) (citing *State v. Makarchuk*, 2009 MT 82, ¶ 14, 349 Mont. 507, 204 P.3d 1213).

¶27 This Court generally will "not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial." *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, __ P.3d __ (citing *State v. Longfellow,* 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694). "We may review such an issue, however, under the plain error doctrine." *Aker*, ¶ 21 (citing *State v. Lacey*, 2012 MT 52, ¶ 14, 364 Mont. 291, 272 P.3d 1288). The decision to invoke plain error review is discretionary. *Aker*, ¶ 21.

¶28 "Only record-based ineffective assistance of counsel claims are considered on direct appeal." *Aker*, ¶ 22 (citing *State v. Howard*, 2011 MT 246, ¶ 18, 362 Mont. 196, 265 P.3d 606). "To the extent such claims are reviewable, 'they present mixed questions of law and fact that we review de novo.'" *Aker*, ¶ 22 (quoting *Howard*, ¶ 18.)

7

## DISCUSSION

¶29    *1. Whether the District Court should have dismissed the charges against Ugalde when, after Ugalde disclosed information and defense strategies to the State Medical Examiner, communication occurred between the Medical Examiner and the Yellowstone County Attorney.*

¶30    On appeal, Ugalde argues her client confidentiality, work product privileges, and due process rights were violated when Dr. Dale, the State Medical Examiner, disclosed information obtained from a confidential consultation with defense counsel to Dennis Paxinos, the Yellowstone County Attorney. She also argues that Paxinos engaged in prosecutorial misconduct by communicating with Dr. Dale and relaying the information to the State's prosecuting attorney.

### A. Client Confidentiality

¶31    The District Court did not abuse its discretion in holding that the conduct of Dr. Dale and Paxinos did not entitle Ugalde to dismissal of the information or a new trial. "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *U.S. v. Rogers*, 751 F.2d 1074, 1076 (9th Cir. 1985).

¶32    A defendant's "access to expert assistance is a crucial element in assuring a defendant's right to effective legal assistance, and ultimately, a fair trial." *Hutchinson v. People*, 742 P.2d 875, 881 (Colo. 1987). The confidentiality of experts "is a crucial element in the effective legal representation of a defendant." *Hutchinson*, 742 P.2d at 882. The District Court correctly recognized, however, that when this duty of confidentiality is breached, the proper remedy is to disqualify the expert. *In re Mitchell*, 981 P.2d 172, 175 (Colo. 1999) (citing *Wang Laboratories, Inc. v. Toshiba Corp.*, 762

8

F. Supp. 1246 (E.D. Va. 1991), *rev'd in part on other grounds*); *see Rogers*, 751 F.2d at 1079 ("If, in fact, Miller revealed a confidential communication in violation of his ethical obligations as an attorney, suppression of that evidence at trial is the appropriate remedy.").

¶33    In *Hutchinson*, the Colorado Supreme Court reversed a conviction on the ground that the prosecution should not have been permitted to call a defense-retained handwriting expert in its case-in-chief.    *Hutchinson*, 742 P.2d at 876. Unlike in *Hutchinson*, the expert at issue here, Dr. Dale, was never called to the stand and offered no testimony.

¶34    In Ugalde's brief in support of her motion to dismiss, she argued that if the test for a breach of confidentiality by a non-attorney expert is met, "disqualification of the expert is compelled."  Her brief further noted that "[t]he policy of excluding an expert who has received this type of information is due to the fact that it is difficult to determine conclusively what impact such information may have on the expert's analysis or subsequent testimony."

¶35    Ugalde argues on appeal that the alleged breach of confidentiality here warrants a new trial or dismissal of the action.  Her brief points out that, "[b]ecause Dr. Dale is not a retained expert for the prosecution in this matter, exclusion is not a remedy for his actions."  But, as the District Court recognized, this does not mean that dismissal is appropriate.  *See U.S. v. Morrison*, 449 U.S. 361, 364-65, 101 S. Ct. 665, 668 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been

9

deliberate.").[1]  To the contrary, the fact that Dr. Dale was not called as a witness means that the type of harm against which exclusion is meant to protect never occurred here in the first place.

¶36    "The trial court has discretion to grant a criminal defendant a new trial but may do so only if required in the interests of justice." *State v. Billedeaux*, 2001 MT 9, ¶ 23, 304 Mont. 89, 18 P.3d 990; § 46-16-702(1), MCA.  The court's decision to deny a new trial must be justified by the law and the weight of the evidence.  *Billedeaux*, ¶ 23; § 46-16-702(3), MCA.  Ugalde relied on an unspoken—and ultimately misguided—assumption that her communications with Dr. Dale were confidential.  The record shows that the prosecution already knew of the problems surrounding Dr. Bennett.  Dr. Dale sent a letter on December 9, 2005—a considerable time before this case was filed—informing the Montana County Coroners and County Attorneys of Dr. Bennett's problematic history.  Ugalde was not affected by Dr. Dale's disclosure of his ultimate opinion that Ugalde intentionally harmed I.N. because this opinion never reached the jury.  Thus, we agree with the District Court that the evidence presented here does not warrant dismissal of the information or a new trial.

*B. Work-Product Privilege*

¶37    Ugalde argues that "[Dr.] Dale's disclosures violated work-product privilege, resulting in unfair and irremediable prejudice to her case."  The work-product doctrine protects against the disclosure of "the mental processes of an attorney, providing a

_____

[1] There is nothing in the record here to suggest that there was a deliberate violation of any confidentiality agreement.

privileged area within which [the attorney] can analyze and prepare [a] client's case." *State v. Miller*, 231 Mont. 497, 513, 757 P.2d 1275, 1285 (1988) (citing *U.S. v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975)). "The reality of our legal system demands that the embraces of the protection also extend to agents of the attorney." *Miller*, 231 Mont. at 513, 757 P.2d 1285.

¶38   Here, it is uncertain to what extent, if any, work product was disclosed. The disclosure of Dr. Dale's ultimate opinion regarding causation is irrelevant because he never testified. Even if he had, his opinion necessarily would have been disclosed to the State prior to his taking the stand. *State v. Anderson*, 211 Mont. 272, 280, 686 P.2d 193, 98 (1984) (citing *State v. Hardy*, 235 S.E.2d 828, 841 (N.C. 1977) ("The privilege is certainly waived when the defendant or the State seeks at trial to make a testimonial use of the work product.")). Ugalde's intention to impeach Dr. Bennett qualifies as work product but it is unclear whether this intention was disclosed to Paxinos. It appears as though Dr. Dale only discussed the problems with calling Dr. Bennett as a witness generally, consistent with his previous letter. In essence, Ugalde argues that she was prejudiced by the disclosure of facts already known to all parties, and the fact that she was denied the chance to impeach an expert who never testified. "The burden to demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling." *State v. Criswell*, 2013 MT 177, ¶ 42, 370 Mont. 511, 305 P.3d 760. Ugalde has not carried her burden of demonstrating that these facts warrant dismissal of the information or a new trial.

### C. Due Process

¶39 Ugalde alleges general due process violations resulting from Dr. Dale's disclosure of information to Paxinos pertaining to Dr. Bennett. "A district court may dismiss an indictment where the government's investigatory or prosecutorial conduct violates a defendant's due process rights." *U.S. v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999) (citing *U.S. v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)). "To violate due process, government conduct must be 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *King*, 200 F.3d at 1213 (quoting *U.S. v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)). When the government's investigatory or prosecutorial conduct has violated a defendant's right to due process, it is within the district court's discretion to dismiss an indictment. *King*, 200 F.3d. at 1213.

¶40 While the communications between Dr. Dale and Paxinos constitute government action, Ugalde does not explain how a due process violation exists when a defendant cannot impeach an expert witness who offers no evidence. Dr. Bennett was contacted regarding this case at a relatively early stage. The State used his professional opinion in the affidavit and motion for leave to file the Information. It may be, given the State's awareness of potential issues with Dr. Bennett testifying, that he was included simply to consult regarding other experts. Ugalde's protestation that this is a "close case" is unconvincing. Even if Ugalde had impeached Dr. Bennett regarding his expert opinion that the injuries were not accidental, the harm to the State's case was minimal because Dr. Bennett's opinion was shared by four other medical doctors who testified at trial.

12

¶41    The District Court determined that the government conduct was not so outrageous or shocking as to infringe Ugalde's due process rights and we agree.

### D. Prosecutorial Misconduct

¶42    Ugalde argues that the District Court failed to consider "the prosecutorial misconduct implicit in Dennis Paxinos['s] actions."[2]    Specifically, Ugalde argues that Paxinos had "an absolute obligation to end the conversation and advise Dale of the doctor's obligation to keep the consultation with defense counsel confidential."

¶43    A new trial may be granted "where the prosecutor's actions have deprived [a] defendant of a fair and impartial trial." *State v. Gray*, 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (1983) (citations omitted).    This Court "measures prosecutorial misconduct by reference to established norms of professional conduct." *State v. Passmore*, 2010 MT 34, ¶ 48, 355 Mont. 187, 225 P.3d 1229 (2010) (citation omitted).

¶44    In *Passmore*, the Court noted that the defendant "cited no cases or professional standards" that supported his argument, and did not establish prejudice since the defendant was not tried under a problematic Information. *Passmore*, ¶ 48.    Ugalde likewise cites no comparable cases or standards and fails to establish prejudice.  Paxinos knew very little about the case when called by Dr. Dale.  Paxinos merely facilitated the transfer of information that was either irrelevant or already possessed by the State.  The record does not show that Paxinos sought an unfair advantage or that he obtained one. While we do not endorse the communications that occurred in this case, we conclude that

---

[2] We limit our analysis to Yellowstone County Attorney Paxinos's conduct, since Ugalde conceded in a brief that "the specific prosecutor in this matter obviously has clean hands . . . ."

13

they did not deprive Ugalde of due process. The District Court did not err in denying Ugalde's motions for dismissal or a new trial on this issue.

¶45   2. *Whether Ugalde is entitled to a new trial on the ground that the State's witnesses were not unnecessarily cumulative or unfairly prejudicial to Ugalde.*

¶46   Ugalde argues that the sheer quantity of the State's witnesses was unnecessary and unfairly prejudiced the jury against her. Specifically, she claims the State called an excessive number of expert witnesses to prove the element of serious bodily injury, contending that "[a]ny of these witnesses would have been sufficient to establish that I.N. suffered serious bodily injury." The District Court disagreed, determining that the State's medical witnesses provided relevant information to the jury without needlessly presenting cumulative evidence. The court observed that each witness testified within his or her own medical specialty and held that although there may have been some overlapping testimony, the evidence was "not nearly as 'cumulative' as the defendant claims."

¶47   "Relevant evidence is generally admissible." *State v. Vandersloot*, 2003 MT 179, ¶ 16, 316 Mont. 405, 73 P.3d 174 (citing M. R. Evid. 402). Cumulative evidence is "additional evidence of the same character to the same point." Section 26-1-102(4), MCA. It is true that the "testimony of one witness is sufficient to prove a fact." *State v. Merrick*, 2000 MT 124, ¶ 13, 299 Mont. 472, 2 P.3d 242. However, cumulative evidence will be deemed harmless "unless the record shows that the error was prejudicial." *State v. Hansen*, 1999 MT 253, ¶ 86, 296 Mont. 282, 989 P.2d 338 (1999) (quoting *State v. Carter*, 285 Mont. 449, 459, 948 P.2d 1173, 1178-79 (1997)); § 46-20-701(1), MCA. "Evidence is unfairly prejudicial when it 'arouses the jury's hostility or sympathy for one

side without regard to its probative value.'" *State v. Meredith*, 2010 MT 27, ¶ 45, 355 Mont. 148, 226 P.3d 571 (citing *State v. Schauf*, 2009 MT 281, ¶ 41, 352 Mont. 186, 216 P.3d 740 (quoting *State v. Bieber*, 2007 MT 262, ¶ 59, 339 Mont. 309, 170 P.3d 444)).

¶48 Ugalde elected to require the prosecution to prove each element of the alleged crime. The prosecution was not merely required to prove that serious bodily injury occurred, but also that Ugalde caused the injuries. The court instructed the jury that the State was required to prove serious bodily injury and causation as elements of the crime. Ugalde argues that the State called only two witnesses to testify regarding causation. Yet even the experts who only testified on the nature and extent of the injuries played a role in proving whether I.N.'s injuries were caused by an accidental fall from a crib or intentionally by some other means. Because Ugalde was the only other person present when I.N. was injured and she presented expert testimony to support her claim that he had fallen from his crib, the prosecution was required to present evidence of the nature and seriousness of the injuries to show that they could not have been sustained from a fall. Thorough review of the record reveals that it is often impossible to separate which evidence went to the causation element and which went to the serious bodily injury element; the extent of the injuries was a factor for the jury to consider in determining both seriousness and causation.

¶49 The District Court reviewed the evidence and properly determined that the State did not parade ten doctors before the jury to testify to the exact same point or offer irrelevant evidence. Ugalde made several objections at trial—some of which were sustained—that the State's experts were being asked to testify beyond their expertise.

Ugalde would have the State walk a tightrope between presenting prejudicially cumulative evidence and failing to call the correct experts to sufficiently explain these complicated medical issues. While the State must stay within the bounds of the Rules of Evidence, the path is nowhere near as narrow as the defense suggests here.

¶50    The District Court determined that this complicated case required the testimony of the different experts and treatment providers to fully explain the cause and extent of the injuries to the jury. We hold that the court's determination was within its discretion.

¶51    *3. Whether Ugalde is entitled to a new trial on the ground that the prosecution presented prejudicial victim impact testimony.*

¶52    Ugalde argues that much of the evidence presented against her was "victim impact evidence," citing to *Armstrong v. State*, 826 P.2d 1106, 1116 (Wyo. 1992), and *U.S. v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994). Victim impact evidence describes "the effect of the crime on the victim and [the victim's] family." *Payne v. Tennessee*, 501 U.S. 808, 821, 111 S. Ct. 2597, 2606 (1991). If victim impact evidence is introduced that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608.

¶53    In *Armstrong*, the Supreme Court of Wyoming held that a prosecutor's suggestion during closing argument that he fought to keep out evidence of cocaine use "to prevent another ordeal for the victim's family" constituted harmless error. *Armstrong*, 826 P.2d at 1116. In *Copple*, the U.S. Court of Appeals for the Third Circuit held that some victim impact evidence was relevant to the issue of intent and therefore admissible, while other

16

evidence regarding the amount of the victim's losses was irrelevant and unfairly prejudicial since the impact of the losses was not at issue in the case. *Copple*, 24 F.3d at 544-45.

¶54 On appeal, Ugalde offers no specific testimony as an example of improper victim impact evidence. We find nothing here akin to the statement in *Armstrong*. Also, as the District Court observed, the evidence presented here bears "little resemblance" to the evidence in *Copple*. Here, the testimony of the State's witnesses was relevant to proving mental state, causation, and serious bodily injury. We hold that the District Court did not abuse its discretion when it determined that the State's evidence was not so prejudicial as to render the trial fundamentally unfair.

¶55 *4. Whether Ugalde is entitled to a new trial on the ground of prosecutorial misconduct during closing argument.*

¶56 The prosecutor began her closing argument with a first-person narrative from the perspective of the infant, relating the State's view of what happened as though I.N. was testifying on his own behalf. During rebuttal, the prosecutor then told jurors that the infant was "speaking to you" and asked the jurors to "tell [I.N.] that you heard him and that you find the Defendant guilty." Ugalde did not object to the State's closing argument.

¶57 Ugalde argues on appeal that the State's closing and rebuttal arguments were improper because certain statements constituted a "golden rule" argument. Ugalde explains that a "golden rule" argument is one in which jurors "are asked to put themselves in a party's place," citing to *State v. Long*, 975 A.2d 660 (Conn. 2009).

Ugalde argues that such arguments are improper because they "appeal to base, visceral emotion, without regard for evidence or proof of guilt." *See Clausell v. State*, 2005 MT 33, ¶ 41, 326 Mont. 63, 106 P.3d 1175 (Nelson, J., dissenting) ("These types of 'Golden Rule' arguments are improper, as they interfere with the jury's objectivity.").

¶58 The District Court concluded that the State's closing and rebuttal arguments were proper, analogizing to *Clausell*. In *Clausell*, this Court concluded that the defendant did not establish that the prosecutor engaged in misconduct where the prosecutor "asked the jury to follow the evidence trail left by [the victim's] body and determine 'what speaks for [the victim]? The evidence, Defendant's actions, Defendant's admissions.'" *Clausell*, ¶ 17. Similarly, the District Court determined the prosecutor's argument in this case urged the jury to follow the trail of evidence and find Ugalde guilty. The court also noted that Ugalde did not timely object to the State's purported violation of the golden rule at trial.

¶59 "A prosecutor's misconduct may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *Clausell*, ¶ 11 (citing *State v. Gray*, 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (1983)). If a timely objection is not made at trial, however, the issue is waived; post-trial objections do not properly preserve an issue for appeal. Section 46-20-104(2), MCA, *State v. McWilliams*, 2008 MT 59, ¶¶ 43-47, 341 Mont. 517, 178 P.3d 121; *State v. Misner*, 2007 MT 235, ¶¶ 24-26, 339 Mont. 176, 168 P.3d 679; *State v. Grace*, 2001 MT 22, ¶ 35, 304 Mont. 144, 18 P.3d 1008. A timely objection must be made "as soon as the grounds for the objection become apparent." *Grace*, ¶ 35.

¶60 We will apply plain error review only "in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Aker*, ¶ 21 (citing *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799). We often have "refused to conduct plain error review of a prosecutor's comments" in other similar contexts, such as closing arguments regarding witness credibility, "even in cases where we have concluded that the comments were improper." *Aker*, ¶ 29; *e.g. State v. Lindberg*, 2008 MT 389, ¶ 33, 347 Mont. 76, 196 P.3d 1252.

¶61 This Court held in a previous case that defense counsel was not deficient for remaining silent when a prosecutor purported to speak as the deceased victim, where "all material statements contained in the prosecutor's narration from the standpoint of the victim were supported by testimonial or other evidence admitted at trial." *Kills On Top v. State*, 273 Mont. 32, 50-51, 901 P.2d 1368, 1380 (1995). In *U.S. v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009), the Eighth Circuit Court of Appeals held that "a prosecutor's brief claim to 'speak for' a victim is improper if, in the context of surrounding statements, the comment appeals excessively to jurors' emotions." Where "the surrounding statements focused jurors' attention on the government's evidence," however, the comment was held not to be improper. *Rodriguez*, 581 F.3d at 803. Although the *Rodriguez* court noted a split of authority on the issue, it observed that speaking for a victim does not necessarily result in error. *Rodriguez*, 581 F.3d at 803 (citing *Sanchez v. State*, 41 P.3d 531, 535 (Wyo. 2002); *State v. Braxton*, 531 S.E.2d 428,

19

455 (N.C. 2000); *Henderson v. State*, 583 So.2d 276, 286 (Ala. App. 1990)). Even those cases cited as contrary authority did not conclude that "speaking for" the victim alone required reversal of a conviction. *E.g. U.S. v. Lowder*, 5 F.3d 467, 473-74 (10th Cir. 1993); *People v. Brown*, 624 N.E.2d 1378, 1388, 1391-92 (Ill. App. Ct. 1993); *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. App. 1992). The Ninth Circuit's decision in *Drayden v. White*, 232 F.3d 704 (9th Cir. 2000), is similar. In that case, the court held that the defendant's trial was not rendered "fundamentally unfair" by the prosecutor's improper delivery during his closing argument—from the witness chair—of a lengthy soliloquy purporting to tell the story of the homicide victim. Among other things, the court noted that "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence. In other words, had the prosecutor delivered exactly the same speech in the third person, it would have been proper." *Drayden*, 232 F.3d at 713.

¶62 Although the prosecutor in this case purported to speak for the victim, she then asked the jury to consider the witnesses' testimony carefully because "[I.N.] can't tell you what happened on June 11th of 2008." The State did not expressly invite the jury to put itself in the shoes of the victim. Considering the State's closing argument in its entirety, we observe that the argument following the challenged comments directed the jury to the evidence and its relationship to the elements of the offense. *Makarchuk*, ¶ 24 ("We consider alleged improper statements during closing argument in the context of the entire argument."). While we do not decide whether the prosecution's argument was objectionable, we conclude after a review of the record and the District Court's careful

20

consideration of the issue that—in the context of the surrounding statements—it did not rise to the level of plain error. The Dissent's strong statement that prosecutors are suffering no "actual consequences" of "violat[ing] ethical rules" by committing misconduct during argument (Dissent, ¶ 118) overlooks its earlier recognition that this Court has not yet decided whether a first-person narrative constitutes misconduct (Dissent, ¶ 105). We decline to overturn the jury's verdict on the basis of an argument that was not made at trial and that has not been held to be grounds for a new trial by this Court or by other courts to have considered the issue under similar circumstances. Ugalde waived her right to raise this claim on appeal by failing to object to the State's closing arguments during trial. The District Court did not abuse its discretion in denying her motion for a new trial on this issue.

¶63    5.    *Whether Ugalde is entitled to a new trial because her counsel provided ineffective assistance.*

¶64    Ugalde argues that her counsel provided ineffective assistance due to an "inherent conflict" in the management of conflict cases by the OPD, which made it impossible for counsel to exercise independent judgment. She further argues that defense counsel's failure to ensure the confidentiality of an expert witness, to object to late disclosure of a new expert by the prosecution, to stipulate to serious bodily injury, to object to victim impact testimony, and to timely object to the prosecution's closing arguments constitutes ineffective assistance and denied her a fair trial.

¶65    A defendant's right to effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and by Article II, § 24 of

the Montana Constitution. "Before reaching the merits of an ineffective assistance of counsel claim in a direct appeal, we 'must first determine whether the allegations are properly before the Court on appeal or whether the claim should be raised in a petition for post-conviction relief' pursuant to § 46-21-101, MCA." *Aker*, ¶ 34 (quoting *State v. Upshaw*, 2006 MT 341, ¶ 33, 335 Mont. 162, 153 P.3d 579). "If the claim is based on matters outside of the record, 'we will refuse to address the issue on appeal.'" *Aker*, ¶ 34 (quoting *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095). If a claim is reviewable on appeal, however, the claim "present[s] mixed questions of law and fact that we review de novo." *Aker*, ¶ 22 (quoting *Howard*, ¶ 18).

¶66 If we determine that an ineffective assistance of counsel claim is based on the record, we analyze the claim under the two-part test set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under *Strickland*, a defendant bears the burden of proving: "(1) that counsel's performance was deficient; and (2) that counsel's deficient performance prejudiced the defense." *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861 (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). "To prevail on an ineffective assistance claim, a defendant must satisfy both prongs of this test. Where the defendant makes an insufficient showing as to one prong of the test, it is unnecessary to address the other prong." *Hammer v. State*, 2008 MT 342, ¶ 10, 346 Mont. 279, 194 P.3d 699 (2008) (citing *Whitlow*, ¶ 11).

¶67 As Ugalde raises a number of unrelated claims, we discuss each in turn.

*A. Inherent Conflict of Interest*

¶68    Ugalde argues that defense counsel was "unable to effectively represent [her] due to the inherent conflict arising from the centralized nature of the Office of the Public Defender . . . ." She points specifically to the contract coordinator's ties to the OPD and the requirement that the OPD approve expenditures over $200 by contract defense attorneys. To support her position, she offers a 2009 study conducted by the American University Criminal Courts Technical Assistance Project, suggesting that structural issues with the OPD's contract coordinator position allow undue influence over contract counsel by the OPD. These allegations properly are before the Court on appeal and this issue may be addressed directly.

¶69    A lawyer is obligated to maintain professional independence. "A lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." M. R. Prof. Conduct 5.4(c).

¶70    Sufficient prejudice under *Strickland*'s second prong requires that the defendant "demonstrate that a reasonable possibility exists that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Hammer*, ¶ 11. A cursory look at this issue is enough to determine that Ugalde was insufficiently prejudiced to warrant reversal. Ugalde's counsel was required to obtain approval for expenditures and the contract coordinator shelved a preliminary request for a specific pathologist pending consultation with Dr. Dale. After consulting with Dr. Dale, however, defense counsel never renewed the request for the pathologist and instead requested another doctor. This

second request was approved. In addition, two out-of-state expert witnesses testified for the defense, and Ugalde was represented by two attorneys at trial. Ugalde has not shown that any of her requests for resources was not provided; she has shown only that one request was not renewed because her counsel chose another expert. No one has argued that responsibility for this choice rested on anyone other than defense counsel; indeed, we will not assume that, when a lawyer is required to request approval or consult with an expert, that she automatically abandons her own professional judgment.

¶71 Ugalde's claim that her "choice of an expert witness was frustrated" is thus without merit and therefore the larger issues that she argues are implicated by the 2009 study will not be addressed at this time. Because the OPD approved Uglade's ultimate choices for expert witnesses, she has not shown prejudice from a conflict of financial interest between the OPD and contract counsel.

### B. Failure to Ensure Confidentiality of a Witness

¶72 Ugalde claims that she received ineffective assistance of counsel when defense counsel failed to "explicitly and independently ensure confidentiality before disclosing critical case strategy . . . ." Ugalde adds to this claim that defense counsel's failure to raise the Yellowstone County Attorney's prosecutorial misconduct before the District Court also was ineffective assistance.

¶73 Having determined above that the disclosures by Dr. Dale to Paxinos were insufficient to affect the outcome of the case, we now hold based on the same reasoning that Ugalde cannot demonstrate a reasonable possibility that, but for counsel's error, the result of the proceeding would have been different.

24

## C. Failure to Object to the Late Disclosure of Dr. Smith

¶74 Ugalde argues that "competent counsel would have objected" to the State's disclosure of a new expert witness "a mere fourteen days before trial." This issue was not raised until Ugalde's post-trial motion, but the record is sufficient to address the issue directly.

¶75 Under the first prong of *Strickland*, deficient performance is performance that "[falls] below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow*, ¶ 20. The burden of proving deficient performance is on the defendant. *Howard*, ¶ 22. When "scrutinizing counsel's actions, we are highly deferential, indulging a 'strong presumption that counsel's performance falls within the wide range of reasonable professional assistance.'" *Howard*, ¶ 22 (quoting *Kills On Top*, 273 Mont. at 49, 901 P.2d at 1380). In *Howard*, this Court determined that the defendant did not meet his burden to show deficient performance for failure to ascertain whether two child witnesses were competent to testify after noting that the defense's cross-examination was thorough and that an investigator was employed during discovery to take the witness's statements. *Howard*, ¶ 28.

¶76 Ugalde fails to identify how additional time to prepare would have aided the defense. The fact that defense counsel did not object to the timing of Dr. Smith's disclosure suggests that the defense did not perceive the disclosure to be harmful at the time. Similar to *Howard*, defense counsel took advantage of the opportunity to interview Dr. Smith before trial. Likewise, the defense was able to thoroughly cross-examine him

25

regarding complicated medical issues and even called an expert who directly addressed and rebutted many of Dr. Smith's opinions. The record does not support Ugalde's claim of deficient performance by counsel here.

### D. Failure to Stipulate to Serious Bodily Injury

¶77 Ugalde claims that defense counsel's discomfort to stipulating was "unpardonable" and describes the failure to stipulate to the element of serious bodily injury as the "most serious oversight" by defense counsel. Yet, to come to this conclusion, Ugalde assumes that the District Court radically would have restricted the State's expert testimony if defense counsel had stipulated.

¶78 This assumption is insufficient to demonstrate ineffective assistance of counsel. While the trial court may have limited some testimony where it could determine that the testimony only went to the element of serious bodily injury, as discussed above, proving causation in this case required analysis of I.N.'s injuries. Therefore the State still may have needed to call many of the same witnesses to testify about the nature of the injuries. Ugalde's argument to the contrary is speculative. Ugalde "bears the burden to show that [her] counsel's performance fell below an objective standard of reasonableness." *State v. St. Germain*, 2007 MT 28, ¶ 33, 336 Mont. 17, 153 P.3d 591. *Strickland*'s first prong "carries a strong presumption in favor of the State, as counsel is allowed wide latitude in deciding what tactics [counsel] should, and should not, employ in defending [a] client." *Kougl*, ¶ 11. The record shows only that defense counsel was "not comfortable" stipulating to an element of the crime; putting the State to its burden of proof was not deficient performance.

*E. Failure to Object to Victim Impact Testimony*

¶79 Ugalde argues that defense counsel's failure to object to victim impact testimony, when "taken in conjunction with the other errors by defense counsel," constitutes a failure to provide effective representation. She concedes, however, that "it is not certain such objections would have been sustained, and it is less certain they would have changed the outcome . . . ." We already have pointed out above that Ugalde offers no specific statements as examples of victim impact evidence. We also have determined that the District Court did not abuse its discretion in determining that the State's evidence was not sufficiently prejudicial to render the trial fundamentally unfair. We therefore conclude that Ugalde has failed to prove prejudice sufficient to meet the requirements of *Strickland*'s second prong.

*F. Failure to Object to Improper Closing Argument*

¶80 Ugalde claims that defense counsel's failure to object to the State's closing argument, during which the State spoke from the perspective of the injured child, constitutes ineffective assistance of counsel. The State's closing argument began with several brief, but undeniably emotional statements. The prosecutor—while pretending to be I.N.—said, "Now, I can't hang out with kids my own age because I can't say what I want or do what I need. I can't tell my mom I love her. I can't say what I want or do what I need because at age two-and-a-half I can only say three words." Next, the State communicated that, while I.N. personally was unable to testify, the jury had "heard from numerous witnesses about what happened to [I.N.] on that day." The State then proceeded to carefully and properly discuss the evidence introduced by each witness.

27

¶81 During its own closing, the defense deftly focused on the State's difficulty in eliminating the possibility of an accidental cause. The defense observed that the State's experts could not completely rule out non-accidental trauma, and also that the State did not rebut evidence that I.N. was capable of pulling himself up and over the low-placed bars of the crib. The defense conceded that the injuries were "horrible and tragic" and entreated the jury to conclude that "[w]hat happened in this case was a horrible accident, not a crime."

¶82 "In scrutinizing counsel's actions, we are highly deferential, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Howard*, ¶ 22 (citation omitted). "Because many lawyers refrain from objecting during . . . closing argument, absent egregious misstatements, the failure to object during closing argument . . . is within the 'wide range' of permissible professional legal conduct." *Kills On Top*, 273 Mont. at 50-51, 901 P.2d at 1380 (quoting *U.S. v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (citation omitted). "This Court has determined . . . that failure to object does not qualify as unreasonable conduct by trial counsel." *State v. Lacey*, 2012 MT 52, ¶ 28, 364 Mont. 291, 272 P.3d 1288 (citing *Clausell*, ¶ 20).

¶83 In *Kills On Top*, this Court held that the appellant's trial counsel was "not deficient in failing to object to the prosecutor's closing argument" when the prosecutor portrayed himself as the victim. *Kills On Top*, 273 Mont. at 50, 901 P.2d at 1380. Similarly—in light of the evidence presented in this case and considering the State's closing argument as a whole—we conclude that defense counsel's conduct falls within

28

the wide range of reasonable professional conduct.  Ugalde has not met her burden of demonstrating deficient performance as required by *Strickland*'s first prong.

*G.  Conclusion*

¶84    In summary, we determine that all of Ugalde's ineffective assistance of counsel claims are reviewable on direct appeal.  Having reviewed those claims de novo, we conclude that Ugalde has not met the *Strickland* standard.

**CONCLUSION**

¶85    Finding no error in the District Court's trial or post-trial rulings, the conviction is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JIM RICE

Justice Laurie McKinnon, dissenting.

¶86    After consideration of the record in its entirety, I conclude there was plain error when the prosecutor "channeled" the eight-month-old victim during closing arguments.  Accordingly, I respectfully dissent from the Court's holding under Issue 4 that the District Court did not abuse its discretion in denying Ugalde's motion for a new trial.

¶87    While under the care and supervision of his babysitter (Ugalde), eight-month-old I.N. suffered a serious head injury causing acute bilateral subdural hematomas, brain swelling, and severe bilateral retinal hemorrhaging.  As a result, I.N. likely will have

29

permanent deficiencies in his motor skills and cognitive development. It is doubtful that a prosecutor could have a more sympathetic victim than an eight-month-old infant who, allegedly, was abused by his caretaker.

¶88 In the Information, the State alleged that Ugalde had "purposely or knowingly caused serious bodily injury to another, to-wit: the Defendant shook or slammed I.N. (born in October 2007) causing him serious bodily injury," in violation of § 45-5-202(1), MCA ("A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another . . . ."). As is an accused's right, Ugalde was not comfortable with stipulating to "serious bodily injury" and, thus, required the prosecution to meet its burden of proving every element of the offense charged. Nevertheless, in her opening statement, defense counsel acknowledged to the jury that I.N. had suffered serious bodily injury: "[Nevada] had her own young child, and she was baby-sitting [I.N.] in her own home when he suffered a terrible accident and he was seriously injured." During her closing argument, defense counsel again acknowledged that "I told you out of the gate we weren't going to contest that the injuries were serious in this case. That was never an issue. The issue in this case is causation."

¶89 Ugalde's approach is understandable, given that her defense related to causation. Testimony regarding the nature of I.N.'s injuries overlapped with testimony regarding the seriousness of those injuries, and defense counsel could not risk that a pretrial stipulation to "serious bodily injury" would foreclose her from examining experts at trial regarding the nature of the injuries as relevant to causation. We implicitly acknowledge counsel's dilemma in our observation that a "[t]horough review of the record reveals that it is often

30

impossible to separate which evidence went to the causation element and which went to the serious bodily injury element; the extent of the injuries was a factor for the jury to consider in determining both seriousness and causation." Opinion, ¶ 48.

¶90 Consequently, the prosecution produced ten witnesses who testified to various aspects of I.N.'s injuries and treatment—much of it overlapping and cumulative. While it would be unreasonable to prevent the State from developing its case regarding serious bodily injury, a defendant does not waive objections to prejudicial or cumulative evidence by insisting that the State meet its burden of proof. Ugalde still had the right to have relevant evidence excluded from consideration by the jury if its probative value was substantially outweighed by the danger of unfair prejudice or by considerations of needless presentation of cumulative evidence. M. R. Evid. 403.

¶91 The District Court refused to hold the State at fault "for preparing a thorough presentation of its case" and ultimately determined, in balancing the cumulative and prejudicial nature of the evidence against its probative value, that the complicated nature of I.N.'s injuries warranted testimony from each of the ten witnesses. In my view, this was a close call. However, we review such rulings for abuse of discretion, and the question under this standard is not whether we would have reached the same decision, but whether the trial judge acted arbitrarily without conscientious judgment or exceeded the bounds of reason. *Newman v. Lichfield*, 2012 MT 47, ¶ 22, 364 Mont. 243, 272 P.3d 625. I agree with the Court's implicit holding that the District Court did not act arbitrarily without conscientious judgment or exceed the bounds of reason in allowing the prosecution to present the testimony of all ten witnesses. Opinion, ¶¶ 49-50. Given that

31

I.N. suffered a serious head injury, it is not surprising that the impact of this primary injury would be observed through many, if not all, aspects of I.N.'s physical and mental well-being.

¶92    Nevertheless, the impact on the jury of hearing ten experts testify to each aspect of I.N.'s injuries and treatment is relevant to, and provides context for, the prosecutor's improper closing argument.  The State's first witness was Dr. Brian Starr, I.N.'s pediatrician.  Dr. Starr testified that before the June 11, 2008 injury, I.N. was a developmentally normal child, but that since the injury, I.N.'s skull was not growing normally.  Dr. Starr stated that this was indicative of a severe brain injury and that I.N. is permanently impaired as a result of this injury.  Dr. Starr also stated that he has treated children who suffered short-distance accidental falls and that he had never seen, in such cases, the same "constellation of injuries" that I.N. had suffered.

¶93    Next, Holly Taylor, a physical therapist, described I.N.'s motor skills and how I.N.'s developmental delays in his motor skills are a result of his brain injury.  Tanya Sciuchetti, a pediatric occupational therapist, also testified that I.N. was delayed in his motor skills due to his brain injury.  Carol Morse, a speech and language pathologist, testified that I.N.'s speech development has been delayed as a result of his brain injury.

¶94    Dr. Eugen Dolan, a neurological surgeon, testified that I.N. suffered a severe head injury with bleeding inside the skull.  When cross-examined on causation, Dr. Dolan was somewhat equivocal but did agree that I.N.'s injuries could have been caused by the trauma of falling from a crib.  He admitted that he could not rule out accidental trauma as a potential cause.  Dr. Linda Johnson, a pediatrician, also described I.N.'s injuries and her

treatment of those injuries. She stated that I.N.'s injuries were severe, and she was 95 to 97 percent sure that the injuries were the result of nonaccidental trauma.

¶95 Dr. Curtis Lee, an emergency room physician, testified that it was apparent I.N. had suffered "a severe head trauma." He described I.N.'s injuries and testified about his treatment of I.N. Dr. Lee acknowledged that he had not ruled out accidental trauma as a potential cause of the injuries; however, he opined that the history he had been given regarding the mechanism of injury—i.e., that I.N. had fallen out of a crib—did not account for the severity of the injuries he had observed in I.N.

¶96 Dr. Andrew Sirotnak, of Denver Children's Hospital in Colorado, is a pediatrician who specializes in child abuse cases. Dr. Sirotnak described I.N.'s injuries and testified that these injuries were not consistent with a linear fall of less than three feet onto a carpeted floor. Rather, in his opinion, this was a case of physical abuse or nonaccidental trauma. While he could not specify the mechanism of injury, Dr. Sirotnak opined that I.N.'s injuries were consistent with rapid acceleration-declaration, such as whiplash.

¶97 Dr. Daniel Weaver, a pediatric ophthalmologist, described the injuries to I.N.'s eyes and stated that surgical treatment of the eyes had been necessary due to I.N.'s head injury. Dr. Weaver testified that, in his experience, he had never seen I.N.'s constellation of injuries—bilateral retinal hemorrhages, bilateral vitreous hemorrhages, and an afferent pupil defect—in a child who had fallen from a height of less than four feet. He conceded, however, that such injuries could result from such a fall.

¶98 Lastly, Dr. Wilbur Smith, a pediatric radiologist, testified that I.N. had suffered severe abusive head trauma. In Dr. Smith's opinion, I.N.'s injuries were not the result of

a short-distance fall but, rather, were the result of being shaken or slammed. He concedes on cross-examination, however, that the nature of the injuries by themselves did not establish abusive treatment by a caregiver—for example, they theoretically could have been the result of a motor vehicle accident—and thus it was necessary to consider the reported history about the injuries. Nevertheless, Dr. Smith maintained the opinion that I.N.'s injuries were not due to a fall from his crib.

¶99 In addition to the foregoing experts, the State called Susan Napier, I.N.'s mother. Through Susan, the State introduced State's Exhibits 3 through 6 into evidence. Exhibits 3 and 4 are pictures taken of eight-month-old I.N. at his sister's birthday party on June 1, 2008. Exhibit 5 is a picture of I.N. at the hospital in June 2008 following his injury. He is shown in a medically induced coma with IVs, a catheter, and a head wrap. Exhibit 6 is a picture of I.N. in January 2009 after his second eye surgery. He is shown with a patch over his left eye.

¶100 The prosecution's initial closing argument, presented by Deputy County Attorney Juli Pierce, began as follows:

> May it please the Court, counsel, ladies and gentlemen of the jury. What a difference a day makes. Before June 11th of 2008, I was a normal, healthy, happy kid. My parents and I had hopes and dreams for me. This is me on June 1st of 2008 at my sister Anastasia's birthday party. [Jury is presumably shown State's Exhibits 3 and 4, depicting I.N. at the birthday party.] After June 11th of 2008, I would never ever, ever be the same again. My life and the lives of my family would be drastically changed forever because of what my baby-sitter, the Defendant, did to me.
> That morning, on June 11th of 2008, I was a normal kid. My mom and my grandma dropped me off at the Defendant's house who had been baby-sitting me for a couple of months. Sometime in the early afternoon, my trusted caretaker, that woman, shook me and slammed me to the point of having severe closed head injury causing me to look like this. [Jury is

34

presumably shown State's Exhibit 5, depicting I.N. in a medically induced coma.] And after June 11th of 2008, I had more and more surgeries, and more issues, and the Defendant caused me to look like this. [Jury is presumably shown State's Exhibit 6, depicting I.N. following his second eye surgery.] Now, I can't walk normally without braces on, or else I walk on my tiptoes. Now, I can't hang out with kids my own age because I can't say what I want to do or what I need. I can't tell my mom I love her. I can't say what I want or what I need because at age two-and-a-half I can only say three words. [Jury is shown a video, apparently State's Exhibit 19, which shows I.N. at his home interacting with his mother in April 2010.] My life will never be the same, and my family's lives will never be the same because of what the Defendant did to me on June 11th of 2008.

At the conclusion of her argument, Pierce asked the jurors to "tell the Defendant that you know what happened that day, and you find her guilty."

¶101 At the outset of her rebuttal closing argument, Pierce remarked: "We talked . . . at length in voir dire about child abuse. We talked about child abuse usually occurring behind closed doors, two people, perpetrator/victim." Pierce asserted that "[I.N.] was the only witness, besides the Defendant, to tell you what happened to him on June 11th of 2008." (I.N. did not actually testify.) Pierce concluded with the following: "[I.N.] can't speak. He can't sit in that chair and tell you what happened to him. But you heard all those witnesses, and it's like [I.N.] was speaking to you. And you tell [I.N.] that you heard him, and you find the Defendant guilty."

¶102 "Channeling the victim" is a technique by which a lawyer speaks to the jury in the first person as though she is the injured or deceased person. It is calculated to produce a dramatic and emotional impact on the jury by bringing to life in the courtroom a dead victim or a victim who—as here—cannot testify. In my view, a prosecutor who channels an eight-month-old infant, states that "I can't tell my mom I love her," and asks the jury

35

to "tell [the infant] that you heard him" has engaged in misconduct calling into doubt the fundamental fairness of the trial itself.

¶103  Channeling gained national attention in conjunction with John Edwards's 2004 presidential campaign. Nineteen years earlier, Edwards (a North Carolina lawyer at the time) litigated an action against an obstetrician for negligently failing to perform a cesarean section that allegedly would have prevented the child's cerebral palsy. Edwards stood before the jury and channeled the words of the unborn baby girl. Referring to an hour-by-hour record of a fetal heartbeat monitor, he told the jury: "She said at 3, 'I'm fine.' She said at 4, 'I'm having a little trouble, but I'm doing O.K.' Five, she said, 'I'm having problems.' At 5:30, she said 'I need out.' " Edwards continued: "She speaks to you through me. And I have to tell you right now – I didn't plan to talk about this – right now I feel her. I feel her presence. She's inside of me, and she's talking to you." The jury awarded Edwards's client $6.5 million, but the trial court subsequently ruled the award "excessive," observing that it had been given "under the influence of passion and prejudice." The parties ultimately settled for $4.25 million. *See* Adam Liptak & Michael Moss, *In Trial Work, Edwards Left A Trademark*, N.Y. Times (Jan. 31, 2004).

¶104  Most likely attributable to CLE presentations and trial-advocacy publications, the "art" of channeling has spread beyond the civil trial. Prosecutors apparently will risk manipulating and misstating the evidence in order to present an emotional appeal, even when they have ample and convincing evidence to convict. *Drayden v. White*, 232 F.3d 704, 711-13 (9th Cir. 2000); *U.S. v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009); *Kills*

*on Top v. State*, 273 Mont. 32, 51, 901 P.2d 1368, 1380 (1995); *cf. Clausell v. State*, 2005 MT 33, ¶ 17, 326 Mont. 63, 106 P.3d 1175; *Clausell*, ¶¶ 40-41 (Nelson, J., dissenting).

¶105   With respect to various types of conduct, this Court has been clear.  It is improper for a prosecutor to offer personal opinions regarding witness credibility.  *State v. Daniels*, 2003 MT 247, ¶ 26, 317 Mont. 331, 77 P.3d 224; *State v. Gladue*, 1999 MT 1, ¶ 15, 293 Mont. 1, 972 P.2d 827; *State v. Rodgers*, 257 Mont. 413, 417, 849 P.2d 1028, 1031 (1993).  Statements by a prosecutor expressing a personal opinion about the guilt of the accused are likewise improper.  *Gladue*, ¶ 21; *State v. Stringer*, 271 Mont. 367, 381, 897 P.2d 1063, 1071-72 (1995).  It also is improper for the prosecutor to comment on evidence not of record during closing argument.  *Gladue*, ¶ 14.  However, this Court has not addressed directly whether channeling the victim in closing argument constitutes reversible misconduct.

¶106   The issue arose in *Kills on Top*, where we considered whether defense counsel's failure to object to the prosecutor's summation of the evidence, in which the prosecutor portrayed himself as the victim and narrated in the first person, constituted ineffective assistance.  We held that counsel was not deficient because "it appears that all material statements contained in the prosecutor's narration from the standpoint of the victim were supported by testimonial or other evidence admitted at trial."  *Kills on Top*, 273 Mont. at 51, 901 P.2d at 1380.  But we declined to consider whether channeling the victim actually constituted prosecutorial misconduct.  *Kills on Top*, 273 Mont. at 62, 901 P.2d at 1387.

¶107   In the civil context, the issue of channeling arose recently in a medical malpractice action where the plaintiff's attorney assumed the persona of the plaintiff's deceased

husband and delivered a first-person narrative recounting the events leading to his death. *Heidt v. Argani*, 2009 MT 267, ¶ 5, 352 Mont. 86, 214 P.3d 1255. Counsel used phrases such as "oh my God, I'm dying," and then described being autopsied, including a description of being cut open and of the decedent's sorrow at not getting to see his children grow up. *Heidt*, ¶ 5. At this point, one of the jurors announced that she was "not okay" and that she thought she was going to pass out. The defendant-physician (Argani) proceeded to render assistance. *Heidt*, ¶ 6. On appeal, we considered whether the plaintiff's motion for a mistrial should have been granted. *Heidt*, ¶ 12. We concluded, in light of the unique circumstances of the case—i.e., a medical malpractice trial in which the jury gets to see the defendant doctor reacting to a real-life situation and apparently successfully delivering life-saving care—that a mistrial should have been granted. *Heidt*, ¶¶ 16-17. We did not address the propriety of counsel's channeling.

¶108 Outside Montana, the Eighth Circuit observed in *Rodriguez* that a prosecutor may not express an opinion implying knowledge of facts unavailable to the jury and that it is improper to ask jurors to put themselves in the place of the victim. 581 F.3d at 803. However, the Court of Appeals noted disagreement among courts about whether a defendant is unfairly prejudiced by a prosecutor's statement that she "speaks for" a victim. *Rodriguez*, 581 F.3d at 803.[1] While the cases cited in *Rodriguez* are

---

[1] The *Rodriguez* court cited the following cases: *Compare Sanchez v. State*, 41 P.3d 531, 535 (Wyo. 2002) (prosecutor did not err by telling jury: "You and I get to speak for" the victim); *State v. Braxton*, 531 S.E.2d 428, 455 (N.C. 2000) (holding that prosecutor does not err by arguing that he speaks for victim); *Henderson v. State*, 583 So. 2d 276, 286 (Ala. Crim. App. 1990) ("we find no reversible error in a brief statement suggesting that the prosecuting attorney speaks for the victim's family"); *with U.S. v. Lowder*, 5 F.3d 467, 473-74 (10th Cir. 1993)

distinguishable from the present case in that they did not involve a prosecutor narrating in the voice of the victim, the cases nevertheless demonstrate how courts will view the range of prosecutorial conduct.

¶109   Our criminal justice system is premised on certain fundamental principles.  One of those principles was aptly described by Justice Sutherland of the United States Supreme Court almost 80 years ago:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed.  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. U.S.*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).

---

(although the comment did not deprive the defendant of a fair trial, prosecutor made an improper comment to the jury by stating: "Who gets left out?  The victims get left out.  They don't get anybody to talk for them."); *People v. Brown*, 624 N.E.2d 1378, 1388, 1391-92 (Ill. App. 1st Dist. 1993) (prosecutor's statement that "we speak for the victims in this case" was irrelevant to defendant's guilt, and while no single trial error required reversal, cumulative error did); *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. App. E. Dist. 1992) (although the comment did not require reversal, prosecutor made an improper statement by arguing: "The victim, Mr. Booker, isn't here to speak for himself and able or not, it is my job to speak for Mr. Booker and Mr. Booker was a man with a family.").

¶110 In a similar vein, Chief Justice McGrath recently observed that "[a] prosecutor is an officer of the court" who "must strive to promote justice and the rule of law." *State v. Criswell*, 2013 MT 177, ¶ 57, 370 Mont. 511, 305 P.3d 760 (McGrath, C.J., concurring). Unfortunately, however, " 'some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond the permissible limits of argument.' " *Criswell*, ¶ 55 (McGrath, C.J., concurring) (quoting *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 107 (3d ed., Am. B. Assn. 1993)). "Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 107. Accordingly, a prosecutor "should not make arguments calculated to appeal to the prejudices of the jury" and "should refrain from argument which would divert the jury from its duty to decide the case on the evidence." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8(c), (d), 106.

¶111 In *Drayden*, the Ninth Circuit concluded that the prosecutor had engaged in misconduct when he delivered a soliloquy in the voice of the victim. 232 F.3d at 712. The Court of Appeals observed:

> By doing so, the Prosecutor inappropriately obscured the fact that his role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim. Furthermore, the prosecutor seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim and by "testifying" in the voice of the character as

> if he had been a percipient witness. Finally, by testifying as [the victim], the prosecutor also risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim who, in the words of the prosecutor, was a gentle man who did nothing to deserve his dismal fate.

*Drayden*, 232 F.3d at 712-13. I would add to this that channeling also risks infringing the defendant's constitutional right to cross-examine her accusers face to face. U.S. Const. amend VI; Mont. Cost. art. II, § 24.

¶112 In *Criswell*, which involved charges of aggravated animal cruelty, the prosecutor disparaged the defendants during his closing argument, calling them "squatters" and "freeloaders." He also asserted that they had been "run out of Idaho" and implied that one of the defendants had purchased marijuana in lieu of providing food for his cats. *See Criswell*, ¶ 43. While the prosecutor maintained that his remarks had not been intended to inflame the jury or to comment on the defendants' characters, *Criswell*, ¶ 45, Chief Justice McGrath questioned this explanation: "Personally, I find that hard to believe. If not intended to inflame the jury or comment on the Criswells' characters, then what were they intended to do?" *Criswell*, ¶ 57 (McGrath, C.J., concurring). In my view, we should be asking the same question here.

¶113 In her closing argument, prosecutor Pierce stood before the jury, assumed I.N.'s persona, and gave a first-person narrative of "what my baby-sitter, the Defendant, did to me." If not intended to inflame the passions of the jury through an appeal to their sympathies for this already sympathetic infant-victim, then what was this tactic intended to do? This was a case in which the prosecution had presented ample—and, at times, repetitious—testimony about the serious bodily injuries suffered by the victim. The

prosecution also had presented multiple expert opinions that these injuries were not the result of an accidental fall from a crib. As Pierce observed in her closing argument, "witness after witness after witness" testified on these matters. Certainly, the prosecutor properly could have argued the State's view of what these *actual* witnesses' testimony showed. The prosecutor also could have urged the jury "to follow the trail of evidence and find Ugalde guilty." Opinion, ¶ 58 (discussing the District Court's reasoning based on *Clausell*). But that is not what happened.

¶114 The prosecutor here purported to give actual testimony from an absent witness. This testimony reflected Pierce's personal opinions about what I.N. might have said on the witness stand had he been able to appear as a witness. Opinions of this sort, however, are "a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8, Commentary, 108. Such tactics inappropriately obscure the fact that the prosecutor's role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim. *Drayden*, 232 F.3d at 712-13. They seriously risk manipulating and misstating the evidence by creating a fictitious character based on the injured victim and by "testifying" in the voice of the character. *Drayden*, 232 F.3d at 713. And they risk improperly inflaming the passions of the jury through the first-person appeal to its sympathies for the victim. *Drayden*, 232 F.3d at 713. They also deny the defendant the right to cross-examine the fictitious witness.

¶115 The Court refuses to grant relief because Ugalde did not contemporaneously object to the prosecutor's channeling.[2] Opinion, ¶ 62. Somewhat ironically, however, the Court then denies relief on Ugalde's claim of ineffective assistance of counsel (premised on defense counsel's failure to object to the improper closing argument) because "many lawyers refrain from objecting during . . . closing argument" and "failure to object does not qualify as unreasonable conduct by trial counsel." Opinion, ¶ 82 (ellipsis in original, internal quotation marks omitted). It seems to me that if failure to object does not qualify as unreasonable conduct by trial counsel, then we ought to review Ugalde's prosecutorial misconduct claim on its merits. Conversely, if an objection was required in order to preserve this claim for appeal, then defense counsel was ineffective for not making one and we should review the claim. At the very least, the claim should be considered under plain error review.

¶116 We have stated repeatedly that misconduct by a prosecutor may form the basis for granting a new trial where the prosecutor's actions have deprived the defendant of a fair and impartial trial. *State v. Gray*, 207 Mont. 261, 266-67, 673 P.2d 1262, 1265-66 (1983); *State v. Arlington*, 265 Mont. 127, 158, 875 P.2d 307, 325 (1994); *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091. We have also explained

---

[2] The Court cites *Drayden* as support for the Court's decision to deny review of Ugalde's claim. Opinion, ¶ 61. *Drayden*, however, was a federal habeas corpus proceeding. After finding that the prosecutor engaged in misconduct by delivering a soliloquy in the voice of the victim, the Court of Appeals then considered the separate question whether this misconduct warranted the grant of federal habeas relief. In so doing, the court applied a standard of review that is specifically deferential to state-court proceedings. *Drayden*, 232 F.3d at 713. The present case, in contrast, is a direct appeal from a criminal conviction, not a habeas corpus proceeding. And there are no similar federal-state comity concerns in our review of Ugalde's claim. For these reasons, the Court's reliance on the portion of the *Drayden* opinion discussed at ¶ 61 of the Opinion is misplaced.

that the applicability of plain error review must be decided on a "case-by-case" basis. *State v. Sullivant,* 2013 MT 200, ¶ 17, 371 Mont. 91, 305 P.3d 838; *Daniels*, ¶ 20. Under this doctrine, we may review a claimed error that implicates a defendant's fundamental constitutional rights—including claims of prosecutorial misconduct—where failing to review the error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Hayden*, ¶¶ 17, 29-30; *State v. Finley,* 276 Mont. 126, 137-38, 915 P.2d 208, 215 (1996), *overruled on other grounds*, *State v. Gallagher,* 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817.

¶117 Here, I believe the prosecutor's channeling the infant-victim in closing arguments denied Ugalde her constitutional right to a fair trial. The channeling was neither brief nor harmless. It was calculated to play on the emotions and sympathy of the jury. I.N. spoke to the jurors through Pierce, describing the assault, the surgeries, how his life is no longer the same, that he no longer can tell his mother he loved her, and that he can only speak three words. Pierce asserted that "[I.N.] was the only witness, besides the Defendant, to tell you what happened to him on June 11th of 2008." Pierce asked the jurors to tell I.N. that they heard him and to tell Ugalde that they know what happened that day. The evidence presented at trial concerning the impact upon the eight-month-old victim and the cause of his injuries was overwhelming. But that does not justify our overlooking a prosecutor's improper closing argument that was calculated to appeal to the jury's emotions, passion, and sympathy. This tactic undermined the fundamental fairness of the trial. I therefore would reverse for plain error and remand for a new trial.

¶118 In closing, I note there may be many reasons why defense counsel does not object to improper argument by the prosecutor. Counsel may believe that an objection would draw attention to a particular fact or strengthen the argument being made. Counsel may fear a particular response from the judge or the prosecutor that would harm his or her client. It is not inconceivable that defense counsel may allow the prosecutor to continue an improper line of argument and thereby potentially build reversible error into the case. But whatever the reason for defense counsel's silence, this Court's ongoing refusal to address improper arguments such as here perpetuates tolerance of trial tactics that undermine fairness in our tribunals. As I have observed previously, "[t]he message that this increasingly prevalent practice is sending, unfortunately, is that prosecutors in this State can be assured of having their convictions upheld despite comments made during trial which violate ethical rules and 'run the risk of undermining the fundamental fairness of the judicial process.' " *State v. Aker*, 2013 MT 253, ¶ 44, 371 Mont. 491, ___ P.3d ___ (McKinnon & Cotter, JJ., dissenting) (quoting *State v. Lindberg*, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252). Until there are actual consequences, such as reversal of the conviction, the problem is going to persist.

¶119 In response to this, the Court observes that we have "not yet decided whether a first-person narrative constitutes misconduct." Opinion, ¶ 62. However, the fact that this Court has not yet reversed a case due to improper channeling is beside the point. The rules prohibiting this tactic are already well settled. In this regard, the Court does not dispute the following: that a prosecutor "should not make arguments calculated to appeal to the prejudices of the jury," *ABA Stands. for Crim. Just.: Prosecution Function and*

*Def. Function*, Stand. 3-5.8(c), 106; that a prosecutor "should refrain from argument which would divert the jury from its duty to decide the case on the evidence," *ABA Stands. for Crim. Just.: Prosecution Function and Def. Function*, Stand. 3-5.8(d), 106; and that a prosecutor risks "manipulating and misstating the evidence" and "improperly inflaming the passions of the jury" by "testifying" in the voice of the victim, *Drayden*, 232 F.3d at 713. These standards were violated here when the prosecutor, in her closing argument, embarked on a first-person narrative in the voice of the victim. This tactic arguably ran afoul, as well, of our longstanding prohibitions against expressing a personal opinion about the guilt of the accused and commenting on evidence not of record. *Gladue*, ¶¶ 14, 21; *Stringer*, 271 Mont. at 381, 897 P.2d at 1071-72.

¶120   In the end, we fail today in our obligation to provide guidance to the bench and bar on a serious issue in the conduct of criminal proceedings—an issue that the appellant has squarely raised in this appeal. We have rules which establish, at least in my view, that it is improper for the prosecutor during closing argument to employ tactics calculated to play on the emotions and sympathy of the jury. Channeling the victim is clearly designed to do just that. I believe we should say so explicitly, rather than avoid the question on a procedural ground.

¶121   I dissent.

/S/ LAURIE McKINNON