FILED

05/04/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0288

DA 19-0288

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 103

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CLIFFTON WELLS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-18-41A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Gregory D. Birdsong, Birdsong Law Office, PC, Santa Fe, New Mexico

      For Appellee:

          Austin Knudsen, Montana Attorney General, Roy Brown, Assistant Attorney General, Helena, Montana

          Marty Lambert, Gallatin County Attorney, Bjorn Boyer, Deputy County Attorney, Bozeman, Montana

Submitted on Briefs:  February 17, 2021

Decided:  May 4, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Clifton Wade Wells appeals from his November 2, 2018 conviction by a jury of the offense driving under the influence of alcohol in violation of § 61-8-401, MCA.  We affirm.

¶2     We address the following issues on appeal:

*Issue One: Whether the District Court abused its discretion in declining to provide a specific unanimity jury instruction.*

*Issue Two: Whether the District Court abused its discretion in declining to instruct the jury that a witness is presumed to speak the truth.*

*Issue Three: Whether the prosecutor committed plain error in improperly commenting on witness credibility.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On January 7, 2018, Clifton Wade Wells (Wells) was drinking "quite a bit" at the Rhino Casino in Belgrade, where he ran into Peter House (House), whom he had known in high school.  After some amount of time, Wells and House agreed to take Wells' truck to get beer from Town Pump and then go hang out at Wells' place.  En route to Wells' residence, the truck came to a stop in the middle of the road and would not start.

¶4     At 9:17 p.m., Officer Nicole Nelson (Nelson) was on patrol and saw Wells' vehicle stopped in the middle of the road.  Nelson saw Wells standing outside the vehicle next to the driver side door.  Wells then entered the vehicle and closed the door.  Nelson saw the rear brake lights illuminate and, surmising that Wells was attempting to start the vehicle, activated her overhead emergency lights.

¶5     Wells exited the truck and spoke with Nelson.  Nelson observed open containers in the vehicle and that both Wells and House, who was sitting in the passenger seat, had

2

slurred speech and red watery eyes. Nelson could smell alcohol coming from both Wells and the interior of the vehicle. House volunteered that he was "pretty liquored up." Officer Jesse Stovall (Stovall) arrived on the scene and the two officers began conducting field sobriety tests on Wells. House exited Wells' vehicle and, when asked what he was doing, replied "Hey, I'm drunk, hey." As Stovall escorted House away from the roadway, House pointed to Wells and said: "Do not blow! Do not blow!"

¶6 Having apparently forgotten that the truck was inoperable, Wells repeatedly offered to drive the vehicle to move it off the road, which the officers informed him he could not do. Stoval observed that the truck appeared to be out of gas. Wells suggested using the gas can in the rear of the truck, but Stoval declined to do so because the nozzle didn't fit into the gas tank and he was concerned about spilling gasoline onto his uniform. Instead, the vehicle was pushed into a nearby parking lot. There was no discussion during the encounter regarding who had driven Wells' truck to the point where it had apparently run out of gas. A subsequent blood test showed that Wells had a blood alcohol content of 0.334.

¶7 Wells was charged with driving under the influence of alcohol (fourth or subsequent offense) under § 61-8-401, MCA, alleging that Wells "drove or was in actual physical control of a vehicle" while under the influence of alcohol. About a month prior to Wells' trial, House told the prosecutor that he did not remember driving the night of the arrest. At trial, however, both House, who had received immunity for his testimony and testified for the defense, and Wells testified that it was in fact House, not Wells, who drove Wells' truck from the Rhino Casino that night. House testified that his new recollection at trial was due

3

to having looked at his calendar to achieve "a little bit of memory jarring," despite acknowledging that he was not sure in which month the event had occurred.

¶8     House testified that as he was driving, the truck had come to a stop in the road, and he had moved into the passenger seat while Wells looked at the truck. House testified that he had concluded "Well, [we're] not going anywhere for awhile," and proceeded to consume vodka and two or three beers before the police arrived, at which point he continued drinking. House admitted to having multiple lapses in his memory of the event due to his alcohol consumption at the time. Wells testified that he had failed to tell the officers that he had not been driving because he did not want to "throw [House] under the bus" while House testified that he failed to mention it because he "didn't think about it at the time."

¶9     Defense proposed two additional jury instructions relevant here. The first sought to provide a specific unanimity instruction preventing the jury from finding Wells guilty "unless you all agree that the State has proved beyond a reasonable doubt that . . . he was driving the vehicle, or you all agree that he was in actual physical control of the vehicle, while under the influence." The other was that "[a] witness is presumed to speak the truth." The District Court rejected these instructions, concluding that driving was already included within the definition of actual physical control and that the credibility of witnesses was sufficiently addressed in other instructions.

¶10     The State argued to the jury that Wells could be convicted either because he had driven the truck to the point where it ran out of gas, or because he was in "actual physical control" of the vehicle as he climbed into the driver seat when Nelson arrived. The

4

prosecutor contended that, because there was a gas can in the back of the truck, the vehicle was not disabled, and Wells was therefore in a position to exert physical control over it.

¶11     In opening, the prosecutor asked the jury to view House's testimony "with a great deal of skepticism" and "find him not to be a credible witness," arguing House would attempt to "cover" for Wells.  At closing, the prosecutor pointed to the high levels of intoxication by both Wells and House and noted evidence that such intoxication had caused significant gaps in their memories of the event.  According to the prosecutor, House's account of how consulting his calendar before trial had reminded him that he had driven Well's truck from the Rhino Casino was "completely unbelievable" and that "given [House's] level of intoxication that night, the passage of time, the desire to do a solid for Mr. Wells, there's absolutely no credibility in his testimony that he was driving."  As for Wells, the prosecutor went on to describe his testimony as not credible due to his alcohol-induced memory impairment.  The prosecutor also proposed that Wells, in addition to having an impaired memory, had shown a willingness to lie, as evidenced by Wells' statement to police, which he later admitted to be false, that he had had only one beer, and that he had come from McDonalds, rather than from the Rhino Casino and Town Pump. Defense did not object to these statements by the prosecution.

¶12     Wells was convicted of driving under the influence of alcohol.  On appeal he challenges the District Court's rejection of his proposed jury instructions and argues that the prosecution's statements regarding witness credibility constituted prosecutorial misconduct.

5

## STANDARD OF REVIEW

¶13 This Court reviews decisions regarding jury instructions for an abuse of discretion. *State v. Williams*, 2015 MT 247, ¶ 10, 380 Mont. 445, 358 P.3d 127 (citation omitted). The district court's discretion in formulating jury instructions is broad and will only be reversed when a mistake prejudicially affects a defendant's substantial rights. *Williams*, ¶ 10 (citation omitted). We generally do "not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial." *State v. Ugalde*, 2013 MT 308, ¶ 27, 372 Mont. 234, 311 P.3d 772 (quotation omitted). However, we may choose to exercise discretionary plain error review where the alleged error may result in a manifest miscarriage of justice, leaves unsettled questions of fundamental fairness, or compromises the integrity of the judicial process. *State v. Ritesman*, 2018 MT 55, ¶ 21, 390 Mont. 399, 414 P.3d 261 (citation omitted); *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (citation omitted).

## DISCUSSION

¶14 *Issue One: Whether the District Court abused its discretion in declining to provide a specific unanimity jury instruction.*

¶15 Wells first raises the District Court's rejection of Wells' proposed specific unanimity jury instruction. Jury instructions, as a whole, should fully and fairly instruct the jury on the applicable law. *Williams*, ¶ 10 (citation omitted). Under the Montana Constitution, criminal verdicts must be unanimous. Mont. Const. art. II, § 26. Wells points out that the charging statute, the charging document, the evidence presented, the prosecution's closing argument, and the jury instructions all could have allowed individual

jurors to convict Wells by finding either that (a) Wells had driven the truck from the Rhino Casino or that (b) Wells was in "actual physical control" when he got behind the wheel of his truck as police arrived.

¶16 Wells' arguments raise two distinct facets of the unanimity requirement that have often proven surprisingly challenging to disentangle: (1) whether, under a multi-part criminal statute, the jury could have been non-unanimous with respect to what *crime* the jurors believed the defendant to have committed, and (2) whether, when the State alleges multiple bad acts under a single count, the jury could have been non-unanimous with respect to its understanding of the material *facts* that support the conviction. *See generally* Brian M. Morris, *Something Upon Which We Can All Agree: Requiring a Unanimous Jury Verdict in Criminal Cases*, 62 Mont. L. Rev. 1 (2001) (discussing efforts by Montana and federal courts to address unanimity challenges when either a single statute creates separate offenses or multiple bad acts are alleged under a single count).

¶17 Wells argues that the statute under which he was charged actually provided for two independent crimes, making it possible for a jury to have convicted him without being in unanimous agreement regarding which of the two crimes he was guilty of. *See* § 61-8-401, MCA (providing that it shall be unlawful for person under the influence of alcohol to "drive *or* be in actual physical control" of a vehicle on public roadways) (emphasis added)). When a single criminal statute creates multiple crimes, a specific unanimity instruction is required to ensure that the jury is in agreement with regards to which crime the defendant is guilty of. *See State v. Weldy*, 273 Mont. 68, 77-78, 902 P.2d 1, 12-13 (1995) (requiring specific unanimity instruction because felony assault statute requiring a person to either cause

bodily injury with a weapon or reasonable apprehension of bodily injury with a weapon created separate offenses). In contrast, such an instruction is not required when it can be determined that a multi-part criminal statute merely describes alternative means of satisfying a common element of a single crime. *See Kills on Top v. State*, 273 Mont. 32, 55-56, 901 P.2d 1368, 1383-84 (1995) (holding that aggravated kidnapping statute requiring the kidnapping be done with one of multiple specified purposes, such as to facilitate commission of robbery or to inflict bodily injury on the victim, merely provided alternative means of satisfying the element of purpose and did not require a specific unanimity instruction); *State v. Matz*, 2006 MT 348, ¶¶ 30-32, 335 Mont. 201, 150 P.3d 367 (holding that specific unanimity instruction was not required because statute defining serious bodily injury as risk of death, serious permanent disfigurement, or an expected result of serious permanent disfigurement merely described different means of committing the same offense).

¶18    As the United States Supreme Court has acknowledged, it is "impossible to lay down any single analytical model for determining when two means are so disparate as to exemplify two inherently separate offenses." *Schad v. Arizona*, 501 U.S. 624, 643, 111 S. Ct. 2491, 2503 (1991). However, in Wells' case, we need not resolve this thorny question because the statute at hand does not in reality present any duality requiring such an analysis. Section 61-8-401, MCA, makes it unlawful for a person under the influence of alcohol to "drive or be in actual physical control" of a vehicle on public roadways. Any apparent multiplicity is illusory, as driving is simply one way a person may be in actual physical control of a vehicle. *See State v. Hudson*, 2005 MT 142, ¶ 13, 327 Mont. 286,

8

114 P.3d 210 ("A person has actual physical control of a vehicle when he or she has existing or present bodily restraint, directing influence, domination or regulation of a vehicle." (quotations omitted)). As the District Court properly instructed the jury, a person is in "actual physical control" when an individual is not a passenger and is "in a position to cause the vehicle to move, or control the vehicle's movement in some manner or direction. *Actual physical control of a vehicle includes, but is not limited to, drivin*g, pushing, coasting, or parking a vehicle." *State v. Sommers*, 2014 MT 315, ¶ 35, 377 Mont. 203, 339 P.3d 65 (emphasis added). Under § 61-8-401, MCA, driving is merely a common example of how one might acquire "actual physical control" of a vehicle and is not a statutory alternative that must be analyzed to determine whether it constitutes an independent crime rather than merely an alternative means of committing a single offense. The District Court was not required to give an instruction on the requirement of specific unanimity under § 61-8-401, MCA.

¶19 The second issue presented by Wells' unanimity argument arises from the presence of multiple alleged wrongful acts under a single count, raising the question of whether a specific unanimity instruction should have been given to ensure that the jury was unanimous with regard to the material facts underlying Wells' conviction. This aspect of unanimity requires "more than an agreement that the defendant has violated the statute in question; it requires substantial agreement as to the principal factual elements underlying a specific offense." *State v. Redlich*, 2014 MT 55, ¶ 19, 374 Mont. 135, 321 P.3d 82 (quotation omitted).

¶20 When the State alleges multiple unlawful acts under a single count, a judge may be required to instruct the jury on "its duty to unanimously agree to a particular set of facts" so as to prevent the possibility of a conviction resulting from "different jurors concluding that the defendant committed different acts." *State v. Weaver*, 1998 MT 167, ¶ 34, 290 Mont. 58, 964 P.2d 713 (quoting *United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir. 1983)); *State v. Orsborn,* 170 Mont. 480, 489, 555 P.2d 509, 515 (1976) (noting that the jurors may not simply conclude that a defendant charged with multiple counts was "guilty of something"). Thus, in *Weaver*, we found that a district court was required to provide a specific unanimity instruction to ensure the jury was unanimous with respect to the occurrence of at least one specific act of sexual assault when evidence was presented of multiple unrelated allegations of sexual misconduct taking place over a period of years. *Weaver*, ¶ 38.

¶21 However, there is a limit to the level of specificity to which the members of a jury are required to converge upon in reaching a single understanding of events and the United States Supreme Court has "never suggested that," in cases presenting evidence of several possible overt acts by which the defendant could have committed the crime, "the jurors should be required to agree upon a single means of commission." *Schad*, 501 U.S. at 631, 111 S. Ct. at 2496-97 ("Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." (quotation omitted)). The *Schad* Court noted that a murder conviction had been upheld even where the jury was not required to specify whether a homicide victim's ultimate cause of death was the shooting on board a ship or subsequent drowning once overboard. *Schad*, 501 U.S.

10

at 631, 111 S. Ct. at 2496-97 (citing *Andersen v. United States*, 170 U.S. 481, 18 S. Ct. 689 (1898)).

¶22 The key inquiry in determining whether multiple acts or material facts alleged under a single count require a specific unanimity instruction is whether the acts are so closely related in time, location, and nature that they form part of the same transaction or course of conduct, rather than completely independent occurrences. *Compare Weaver*, ¶ 38 (holding that several alleged discrete acts of sexual misconduct over a period of years required a specific unanimity instruction) *with State v. Harris*, 2001 MT 231, ¶ 15, 306 Mont. 525, 36 P.3d 372, *overruled on other grounds by Robinson v. State*, 2010 MT 108, 356 Mont. 282, 232 P.3d 403 (determining that "persistent illegal acts" of incest over an eight-year period "were so frequently perpetuated and so closely connected as to be properly viewed as a single, continuous, running offense"); *State v. Dahlin*, 1998 MT 299, ¶¶ 26, 30, 292 Mont. 49, 971 P.2d 763 (declining to extend plain error review over specific unanimity argument where the state supported a perjury charge by alleging defendant had made two false statements on the same day, at the same trial).

¶23 Here, the State alleged and presented evidence that an intoxicated Wells had (a) driven his truck from the Rhino Casino until it stopped, and/or (b) assumed actual physical control as police arrived by getting behind the wheel, engaging the brake pedal, and apparently attempting to start the vehicle. These alleged acts occurred in the same physical area and were separated by mere minutes. Both alleged acts fell within the same course of conduct, during which Wells was alleged to have exerted control over his vehicle while attempting to return home from the Rhino Casino in an intoxicated state. The alleged acts

11

by Wells may be merged into a single "continuous, running offense," *Harris*, ¶ 15, and the jurors were not required to unanimously converge on a more specific factual finding by agreeing "upon a single means of commission." *Schad*, 501 U.S. at 631, 111 S. Ct. at 2497 (citation omitted). Some would suggest that the most prudent path may be for a court to provide a specific unanimity instruction whenever multiple acts are alleged under a single count. *See* Morris, *supra* at 57 (concluding that a specific unanimity instruction is the preferred method of addressing potential unanimity issues). However, the District Court did not abuse its discretion here by declining to give such an instruction in Wells' case where the alleged acts could be merged into a single course of conduct.

¶24    *Issue Two: Whether the District Court abused its discretion in declining to instruct the jury that a witness is presumed to speak the truth.*

¶25    Wells argues that the District Court abused its discretion in declining to provide Wells' proposed jury instruction that a "witness is presumed to speak the truth." *See* § 26-1-302, MCA. The jury members were instructed that they were the "sole judges of the credibility or believability of all the witnesses testifying in this case" and that they were to "be fair, impartial and not arbitrary or close-minded." The jury was instructed that it could assess factors related to witness demeanor, potential bias, other witness testimony, and potential false and mistaken testimony in assessing each witness's believability. *See State v. Marble*, 2005 MT 208, ¶¶ 27-28, 328 Mont. 223, 119 P.3d 88 (upholding similar jury instructions on assessing witness credibility). As a whole, these instructions fully and fairly instructed the jury on the applicable law. *See Williams*, ¶ 10. The District

12

Court did not abuse its discretion or prejudice Well's substantial rights by declining to instruct that witnesses are presumed to speak the truth.

¶26 *Issue Three: Whether the prosecutor committed plain error in improperly commenting on witness credibility.*

¶27 Finally, Wells argues that the State committed reversible prosecutorial misconduct by commenting on the credibility of Wells and House as witnesses. While it is "proper to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom," an attorney invades the province of the jury by offering personal opinions on witness credibility. *Aker*, ¶ 26 (quotation omitted). However, we have often declined to exercise plain error review of apparently improper prosecutorial comments on witness credibility where those statements constituted only "very brief deviations from the prosecutor's overall approach." *State v. McDonald*, 2013 MT 97, ¶ 16, 369 Mont. 483, 299 P.3d 799; *Aker*, ¶ 29; *see, e.g.*, *State v. Lindberg*, 2008 MT 389, ¶¶ 33-34, 347 Mont. 76, 196 P.3d 1252; *State v. Rose*, 2009 MT 4, ¶¶ 105-07, 348 Mont. 291, 202 P.3d 749.

¶28 Wells points to *State v. Hayden*, where we reversed for prosecutorial misconduct on plain error review. 2008 MT 274, ¶ 33, 345 Mont. 252, 190 P.3d 1091. The prosecutor in *Hayden* not only argued that two of the State's witnesses were believable, that the jury could "rely on" the investigating officer's testimony, that he was sure all the items found in a search were related to drugs, and that the officers do "good work" in searching for drugs, but also engaged in inter-witness bolstering by inquiring of one witness regarding the credibility of other witnesses. *Hayden*, ¶¶ 14, 31-33. The prosecutor's conduct here

involved no inter-witness bolstering and did not rise to the egregious level described in *Hayden*. The bulk of the prosecutor's statements here simply highlighted the evidence of Wells' and House's heightened state of intoxication at the time of the incident, House's potential motive to protect Wells, and the self-contradictory statements made by both. Any potential misconduct by the prosecutor in crossing into the realm of explicit comments regarding witness credibility here was a "very brief deviation[n]" from the overall approach, *McDonald*, ¶ 16, and did not go so far as to create a "clear danger that the jurors adopted the prosecutor's views instead of exercising their own independent judgment." *Hayden*, ¶ 33. This case does not implicate a potential miscarriage of justice, breach of fundamental fairness, or compromise of the integrity of the judicial process, and we decline to exercise discretionary plain error review here. *See Ritesman*, ¶ 21.

## CONCLUSION

¶29    The District Court did not abuse its discretion in declining to provide Wells' offered jury instructions and we decline to conduct plain error review of the prosecutor's statements not objected to at trial.

¶30    Affirmed.

                                            /S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON