FILED

10/14/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0462

DA 24-0462

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 232

STATE OF MONTANA,

Plaintiff and Appellee,

v.

ERIC RAMIREZ,

Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-23-21
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Carl B. Jensen, Jr., Law Office of Carl B. Jensen, Jr., L.L.C., Great
Falls, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Tammy K Plubell,
Assistant Attorney General, Helena, Montana

Matt Enrooth, Butte-Silver Bow County Attorney, Aaron Rains,
Michael Clague, Deputy County Attorneys, Butte, Montana

Submitted on Briefs:   June 4, 2025

Decided:   October 14, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Eric Ramirez ("Ramirez") appeals his convictions of Criminal Possession with Intent to Distribute (fentanyl), and Criminal Possession with Intent to Distribute (methamphetamine), following a jury trial in the Second Judicial District Court, Butte-Silver Bow County. We affirm, addressing the following issues:

1. *Did the District Court err by denying Defendant's proposed "mere presence" jury instruction?*

2. *Did the District Court err by denying Defendant's proposed witness accountability jury instruction?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 In June 2022, the Southwest Montana Drug Task Force ("Task Force") opened various investigations into drug trafficking organizations that were moving dangerous drugs between California and Southwest Montana. One of the investigations led the Task Force to Trevor Handy ("Handy") and a residence located on Peru Flat in Butte, Montana, where Handy was residing with his parents.

¶3 The U.S. Postal Service identified a suspicious package sent by Martin Topete ("Topete") to Handy's Peru Flat address. The Task Force obtained a federal search warrant authorizing a search of the package and found therein approximately 3,000 fentanyl pills. The Task Force removed the pills from the package, replaced the pills with a filler to maintain the relative weight of the package, inserted an electronic tracking device, and returned the package for delivery.

¶4 On January 10, 2023, the package was delivered to Handy at the Peru Flat residence in a controlled delivery. Shortly after Handy received the package, law enforcement

2

officers arrived, confiscated the package, and arrested Handy. Handy, fearing legal consequences, informed Agent Slease, an agent with the Task Force, that he wanted to cooperate with law enforcement. Handy told Agent Slease about an individual Handy knew as "Rob," a large Hispanic man with tattoos. Agent Slease showed Handy an image of Ramirez, who Handy confirmed he knew as "Rob."

¶5 Handy told officers that Ramirez, along with Topete, were staying at an Airbnb located on Whiteway in Butte, by Ace Hardware. Handy related that he had previously used cocaine with Ramirez at the Whiteway Airbnb and would hang out there for extended periods. Handy described the interior of the Airbnb to Agent Slease and what rooms he believed Ramirez and Topete were staying in. Handy told Agent Slease that Ramirez typically wore Jordan sneakers.

¶6 At the time of Ramirez's trial, Handy was incarcerated on a federal charge of conspiracy to distribute narcotics and had entered a plea agreement with federal authorities. The plea agreement did not require Handy to give testimony against Ramirez. At Ramirez's trial, Handy testified he had driven Ramirez to Helena on at least two occasions so that Ramirez could conduct drug distribution activities, such as picking up drugs and/or cash. Handy testified that on one occasion he saw Ramirez physically make an exchange for drugs or cash with a man named Esco, who was from California. The Task Force had identified Esco as a participant in the drug trafficking organizations it was investigating.

¶7 Agent Slease and other law enforcement officers expanded their investigation into the Whiteway Airbnb and secured a search warrant. Agent Hardy, a police officer also assigned to the Task Force, commenced surveillance of the Whiteway Airbnb. Agent

3

Hardy saw Ramirez, Topete, and Topete's brother, Jonathan, driving away from the Whiteway Airbnb in a gold 4Runner SUV having the numbers "4011" in big block letters on the side. Agent Slease knew this 4Runner to be associated with drug trafficking activity, and it had been seen parked at the Peru Flat residence days before Handy's arrest and included in the search warrant for the Peru Flat residence. The Montana Highway Patrol initiated a stop of the 4Runner for a traffic violation, arrested Ramirez on drug charges, and seized his phone and $1,385 in cash he was carrying on his person. Law enforcement found no evidence of illegal drug dealing on Ramirez's phone.

¶8     Agent Slease and other officers executed the search warrant for the Whiteway Airbnb on the same afternoon, January 10. In a bedroom identified by Handy as belonging to Ramirez, later identified as "Bedroom 1" for investigative purposes, officers found clothing and footwear that matched the size of Ramirez, a man Agent Slease believed to weigh between 260 and 290 pounds. For example, Agent Slease found size 13 Jordan sneakers and pants with a waist size of 42 or 44. Known to Agent Slease, the Topete brothers were much smaller in stature than Ramirez. In a bedroom identified by Handy as belonging to Topete, identified as "Bedroom 2," officers found a coat that had been worn by Topete when traveling.

¶9     Officers found a suitcase and a backpack in Bedroom 1. The suitcase contained 5.6 grams of heroin and a toothbrush that testing revealed as having Ramirez's DNA. The backpack contained 7 bags of fentanyl powder, each weighing approximately 28 grams, a bag of methamphetamine weighing about 409 grams, a bag of benzocaine, and a loaded handgun. Agent Slease testified that benzocaine is a numbing agent that can be used as a

4

bulking agent to increase the sales volume of drugs through dilution. Agent Lorello testified that drug trafficking organizations typically possess firearms, normally taken on trade for drug purchases and often used for protection.

¶10     In the living room and kitchen of the Whiteway Airbnb, investigating officers found additional dangerous drugs packaged in bulk, a digital scale with possible drug residue on it, $4,000 in bulk currency, drug packaging materials, and drug use paraphernalia. Agent Lorello testified that drug trafficking organizations often possess bulk currency due to the cash nature of drug sales, and that digital scales and drug packaging materials are used to facilitate the sale of drugs. Agent Lorello explained that the amount of drugs found in the backpack and other areas of the house, along with the cash and packaging materials, were indicative of distributors selling drugs that could be repackaged into smaller quantities and sold in individual sales. The State charged Ramirez with Count I, Criminal Possession with Intent to Distribute 208 grams of fentanyl; Count II, Criminal Possession with Intent to Distribute 409 grams of methamphetamine; and Count III, Criminal Possession with Intent to Distribute 5 grams of heroin.

¶11     A jury trial was conducted March 18–20, 2024. After the State rested its case, but before the Defendant's case-in-chief, the parties discussed pending jury instructions. Defense counsel requested a mere presence instruction, which stated as follows:

> Mere presence at the time a crime is committed, without interfering, does not make one a party to a crime unless his interference was a duty by reason of some position held by him, or unless noninterference was designed by him and operated as an encouragement or protection; nor does the mere concealment of knowledge that a crime is about to be committed constitute such person an accomplice no matter how reprehensible such conduct may be.

5

Defense counsel explained that Ramirez planned to testify in his own defense and would claim that he was simply visiting friends, was not a drug dealer, or even using drugs. In response, the State argued that there was ample evidence, including both testimonial and physical evidence, that showed Ramirez's intent and actions went beyond mere presence. Defense counsel also requested a witness accountability instruction, which would instruct the jury to view Handy's testimony with distrust, because Handy was "an integral part of at least a good part of what caused the law enforcement to get involved." The State responded that the jury instructions already included a general credibility instruction, and that there was no evidence Handy was legally accountable for Ramirez's charges. The District Court reserved ruling on both instructions until after hearing Ramirez's testimony.

¶12 Ramirez testified that he drove to Montana to visit his friends, the Topete brothers, and to possibly purchase a classic car in Butte. Ramirez explained he planned to leave the night of January 10, before being arrested while driving in the 4Runner. Ramirez claimed he was flying to Hawaii that same evening to see his pregnant fiancée and had previously packed his bags. He admitted he had not purchased a plane ticket for a flight to Hawaii prior to being arrested because he buys tickets "on the spot." Ramirez attested that he had $1,385 in cash on him because he owed child support and didn't want to put his money in a bank where it could be seized. He explained the presence of heroin in his luggage next to his toothbrush by stating: "I'm from California, so it's a normal thing."

¶13 Ramirez denied staying or sleeping in Bedroom 1 but admitted the luggage with the toothbrush and heroin found in Bedroom 1 were his. He explained that his luggage was in Bedroom 1 because, although he slept in a different room downstairs, the downstairs

6

shower had no pressure and that everyone in the house used the upstairs shower. He denied that the backpack containing the fentanyl, methamphetamine, gun, and bulking agent sitting next to his luggage in Bedroom 1 was his. Ramirez denied ever doing cocaine with Handy and or going to Helena with Handy to complete any drug sales or exchanges with Esco, although he acknowledged knowing Esco. Ramirez also denied ever seeing bulk amounts of drugs, drug paraphernalia, packaging, cash, or guns in the Whiteway Airbnb. He also denied being part of, or party to, any drug transactions while staying in the Whiteway Airbnb.

¶14 Following Ramirez's testimony and the close of the Defendant's case-in-chief, the District Court asked the parties to again provide their arguments on the pending jury instructions. Regarding the witness accountability instruction, the defense counsel argued such an instruction would be appropriate because Handy was "obviously culpable." The District Court denied both the mere presence and witness accountability instructions offered by the defense.

¶15 The jury found Ramirez guilty of Count I and Count II, and not guilty of Count III. Ramirez appeals, challenging the District Court's denial of the two instructions.

**STANDARD OF REVIEW**

¶16 "We review a district court's decision regarding jury instructions for an abuse of discretion." *State v. Ellerbee*, 2019 MT 37, ¶ 14, 394 Mont. 289, 434 P.3d 910. "The district court's discretion in formulating jury instructions is broad and will only be reversed when a mistake prejudicially affects a defendant's substantial rights." *State v. Wells*, 2021 MT 103, ¶ 13, 404 Mont. 105, 485 P.3d 1220; *Ellerbee*, ¶ 25. "When considering

7

whether a district court has erred in its jury instructions, 'we determine whether the instructions, taken as a whole, fully and fairly instruct the jury regarding the applicable law.'" *State v. Daniels*, 2011 MT 278, ¶ 38, 362 Mont. 426, 265 P.3d 623 (quoting *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, 152 P.3d 698). "A district court fulfills its duty to instruct the jury on each theory that finds support in the record by giving instructions which accurately and correctly state the law applicable in a case." *Ellerbee*, ¶ 25.

## DISCUSSION

¶17     *1. Did the District Court err by denying Defendant's proposed "mere presence" jury instruction?*

¶18     Ramirez testified that he took no part in the drug distribution activities occurring at the Whiteway Airbnb and that he simply was in the wrong place at the wrong time. On appeal, Ramirez contends the District Court erred by denying his proposed mere presence jury instruction because it was the primary theory of defense that he offered in his testimony, citing *State v. Chaffee*, 2014 MT 226, 376 Mont. 267, 332 P.3d 240. Also citing the criminal drug cases of *State v. Hood*, 89 Mont. 432, 298 P. 354 (1931), and *State v. Gorder*, 248 Mont. 336, 811 P.2d 1291 (1991), wherein we concluded that there was insufficient evidence to support a conviction, Ramirez argues that "[t]he evidence tying [Ramirez] to any of the drugs, let alone the distribution of the same is weaker than the evidence" in either *Hood* or *Gorder*.

¶19     The State responds that "overwhelming circumstantial and physical evidence" that Ramirez was distributing large quantities of fentanyl and methamphetamine was

introduced, including that drugs, a loaded gun, and a cutting agent were found in a bedroom identified as his, and he was carrying a significant amount of cash. As such, the State contends this case is clearly distinguishable from the cases cited by Ramirez and the District Court did not abuse its discretion by denying the proposed instruction.

¶20 The record reveals that the State introduced evidence demonstrating Ramirez was significantly involved with the alleged drug distribution activities the Task Force was investigating. This evidence included, but was not limited to: (1) direct evidence, as well as circumstantial evidence, demonstrating that Ramirez was in possession of bulk amounts of fentanyl, methamphetamines, and heroin, a loaded handgun, bulk amounts of cash, and drug distribution material such as a drug bulking agent, much of which was located in a bedroom containing evidence connecting Ramirez to the contents, including his DNA and identifying clothing; (2) an eyewitness testifying that Ramirez completed drug transactions in Helena; (3) pictures from the living room and kitchen of the Whiteway Airbnb establishing the presence of additional amounts of dangerous drugs besides those found in Bedroom 1, other guns, a scale, bulk amounts of cash, and drug packaging materials; (4) testimony from Ramirez himself that he lived in the Whiteway Airbnb for 4 or 5 days after traveling from California to Montana; and (5) Ramirez's personal possession of a significant amount of cash.

¶21 As the State argues, the authority cited by Ramirez is unavailing. *Hood* and *Gorder* were both sufficiency of the evidence cases, and did not involve a mere presence instruction. Ramirez contends the evidence here is weaker than in those cases, yet he does

not challenge the sufficiency of the evidence for his conviction here, perhaps because the evidence, as described above, appears to be more than sufficient to support his convictions.

¶22 In *Chaffee*, the defendant was charged with accountability for arson and accountability for theft, because she drove a vehicle in which a Robinson was a passenger. At Robinson's request, Chaffee stopped the vehicle near a parked car, whereupon Robinson got out, took items from the parked car, set it on fire, got back in Chaffee's vehicle and told her to drive away. He testified that Chaffee had not participated in the crimes. Robinson was charged with arson and theft. *Chaffee*, ¶¶ 6–7. *Chaffee* was thus an accountability case, wherein the jury was asked to assess Chaffee's criminal responsibility for Robinson's crimes based upon her actions. In closing argument, defense counsel argued that Chaffee's mere presence was not enough to convict her, and, on appeal, the Court reversed her conviction, holding that defense counsel had rendered ineffective assistance by failing to request a mere presence jury instruction to support his argument, reasoning that the instruction "correctly and adequately instructs the jury on the law of accountability." *Chaffee*, ¶ 15.

¶23 Beyond this case not involving an accountability charge, it is further unlike *Chaffee* because the jury instructions given by the District Court here adequately covered Ramirez's theory of the case and permitted him to argue that, while he was present, he was not involved in criminal drug distribution activities, as the law required something more. The District Court properly instructed the jury on the elements of the crime, the State's burden to prove each element, and the definitions of distribution, possession, dangerous drugs, purposely, and knowingly. A mere presence instruction would have reiterated that the State

10

needed to prove each element beyond a reasonable doubt—including that "the Defendant possessed with intent to distribute the dangerous drug fentanyl and/or methamphetamine and/or heroin" and that "the Defendant acted purposely or knowingly." That "something more" than mere presence was required for conviction was clearly conveyed to the jury by the given instructions, and necessarily foreclosed a conviction based upon mere presence. Thus, the District Court "correctly and adequately instruct[ed] the jury on the law." *Chaffee*, ¶ 15.

¶24     As we reasoned in *Ellerbee*, a similar case wherein the defendant, charged with criminal possession, also argued he was simply in the wrong place at the wrong time:

> The District Court did not abuse its discretion by denying Ellerbee's request for a "mere presence" instruction. The District Court properly instructed the jury that Ellerbee had to knowingly possess the drugs. The District Court also instructed the jury on the respective definitions of "knowingly," "possession," and "dangerous drugs"—*sufficiently covering the requirements for a conviction on criminal possession.*
>
> The District Court had the authority to instruct in this way, rather than give Ellerbee's "mere presence" instruction, because it is afforded broad discretion in formulating and approving jury instructions. . . . Based upon the evidence presented at trial, and the instructions provided, Ellerbee cannot demonstrate that the District Court's refusal to give his "mere presence" instruction affected his substantial rights and constituted reversible error.

*Ellerbee*, ¶¶ 32–33 (emphasis added); *see also United States v. Tucker*, 641 F.3d 1110, 1122 (9th Cir. 2011) ("A court may reject a defendant's theory of the case instruction if the other instructions given in their entirety cover the defense theory. . . . A district court may properly refuse to give a 'mere presence' instruction when the government's case rests on 'more than just a defendant's presence, and the jury is properly instructed on all elements of the crime.'") (citing *United States v. Reed*, 575 F.3d 900, 925 (9th Cir. 2009)).

11

¶25 "A district court fulfills its duty to instruct the jury on each theory that finds support in the record by giving instructions which accurately and correctly state the law applicable in a case." *Ellerbee*, ¶ 25. Even assuming the proposed instruction would not have been confusing, given its seeming lack of clarity, we conclude that the District Court provided instructions under which Ramirez could argue his theory of the case, and did not abuse its discretion by denying the instruction. Ramirez's substantial rights were not prejudiced.

¶26 *2. Did the District Court err by denying Defendant's proposed witness accountability jury instruction?*

¶27 "A person may not be found guilty of an offense on the testimony of one responsible or legally accountable for the same offense." Section 46-16-213, MCA. A district court is to instruct a jury, "on all proper occasions[,]" that "the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust." Section 26-1-303(4), MCA. It is within a district court's discretion to judge whether the case is a "proper occasion." *State v. Charlo-Whitworth*, 2016 MT 157, ¶ 10, 384 Mont. 50, 373 P.3d 845 (citing *State v. Johnson*, 257 Mont. 157, 163, 848 P.2d 496, 499 (1993)). "It is proper to give the instruction if there is significant accomplice testimony and the defendant requested the instruction." *Charlo-Whitworth*, ¶ 10 (citation omitted). "However, it is not proper to give an accountability instruction where it is not supported by the evidence and is inconsistent with the defendant's claim of innocence." *State v. Hall*, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239.

¶28 Ramirez argues that Handy was the primary testimony provided by the State, that Handy was an individual actively involved in the distribution of drugs in Butte, and that

12

Handy was legally "culpable for the alleged crimes" charged against Ramirez. However, Ramirez's entire defense was that he was innocent of those charges. As argued by defense counsel in closing:

> There is absolutely no evidence that [Ramirez] was coming up here to do that. There is no evidence of anything in the texts. There's nothing showing that he has done or was intending to do this at all. He is not guilty of these charges. Not a single text. Not a single picture. Not a ledger. Nothing in handwriting. Nothing. No drugs in his possession other than allegedly the heroin.

¶29 We find no merit in Ramirez's argument that he was entitled to a witness accountability instruction. First, the argument that Handy was the primary testimony against Ramirez is incorrect. Handy was one of seven witnesses for the State, with Agent Slease more accurately described as the State's primary witness about the entire investigation of Ramirez. Second, while Ramirez's briefing does not indicate under which subsection of § 45-2-302, MCA, he contends Handy was legally accountable for Ramirez's conduct, asserting only that Handy was generally "culpable." We have explained that "the propriety of [an accountability] instruction presupposes the existence of an accomplice." *Charlo-Whitworth*, ¶ 12. However, there is no evidence supporting the contention that Handy was a participant in Ramirez's distribution activities. Handy was federally charged for his own, different actions. He used drugs with Ramirez, but Ramirez was not charged for this conduct. He drove Ramirez to Helena twice, where Ramirez, and not Handy, met with others, but there was no testimony that Handy knowingly participated in the transactions, or had possession, dominion, control, or even knowledge, of the fentanyl, methamphetamine, or heroin found in Bedroom 1 at the Whiteway Airbnb. Handy had no

13

connection with the backpack or luggage found in Bedroom 1. Third, as we have explained, "if the defendant claims at trial that he did not commit the acts for which he is being tried, he cannot then ask the court to instruct the jury that a testifying witness aided the defendant in the commission of those acts." *Charlo-Whitworth*, ¶ 12. As defense counsel acknowledged when he requested the instruction, he was "a little bit uncomfortable" with the instruction "because there certainly is implied that my client is guilty of something and we're admitting that by use" of the instruction, "[b]ut I still think there should be an instruction." However, Ramirez clearly offered a defense of innocence, and, as such, the District Court did not err in denying the instruction.

¶30 For the foregoing reasons, we affirm the District Court.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON

14